# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREGORY CLOUTHIER; ANN
CLOUTHIER, individually and on
behalf of the Estate of Robert
John Clouthier,
            *Plaintiffs-Appellants,*

                    v.

COUNTY OF CONTRA COSTA;
WARREN RUPF; MATT FOLEY,
Sheriff's Deputy; ERIK STEELE;
MARGARET BLUSH, sued in their
individual capacities and as
employees of Contra Costa
County,
            *Defendants-Appellees.*

No. 07-16703

D.C. No.
CV-06-03893-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
March 10, 2009—San Francisco, California

Filed January 14, 2010

Before: M. Margaret McKeown and Sandra S. Ikuta, Circuit
Judges, and Frederic Block,* District Judge.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Block

*The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

1117

## COUNSEL

Stan Casper and Thomas A. Seaton, Casper, Meadows, Schwartz & Cook, Walnut Creek, California, attorneys for the appellant.

Janet L. Holmes, Office of County Counsel, Martinez, California, attorney for the appellees.

## OPINION

IKUTA, Circuit Judge:

The plaintiffs in this appeal brought an action under 42 U.S.C. § 1983 alleging that a mental health specialist, two sheriff's deputies, and the County of Contra Costa violated the Fourteenth Amendment due process rights of their son, Robert Clouthier, by failing to prevent his suicide while he was in pretrial detention. The district court granted summary judgment in favor of the defendants. We have jurisdiction

under 28 U.S.C. § 1291, and we affirm the district court's grant of summary judgment as to the two deputies and the County, but we reverse as to the mental health specialist because there are genuine issues of material fact as to whether she was deliberately indifferent to a substantial risk of serious harm to Clouthier.

I

On the evening of July 26, 2005, after an argument with his father at the Clouthiers' home, Clouthier became violent, destroyed a china cabinet, and jumped through a plate glass window, resulting in lacerations and severe bleeding. His family called the police; the sheriff's office responded along with ambulance and fire personnel. After Clouthier's father signed a citizen's arrest for battery, the sheriff's office placed Clouthier into custody for both misdemeanor battery and felony vandalism. Clouthier was extremely upset about being taken into custody. As he was taken into the ambulance, he hit his head against the side of the ambulance several times. Once at the hospital, he refused to have his wounds stitched. The next morning, July 27, Clouthier was booked into the Martinez Detention Facility ("MDF").

At MDF, new detainees fill out a mental health questionnaire during the intake process. If an inmate answers "yes" to certain questions, he is interviewed by a member of Contra Costa County Mental Health Services. The Mental Health Services department, run by administrative director Miles Kramer, works in conjunction with the Sheriff's Department by virtue of a contractual agreement. Mental Health Services provides on-site evaluation, counseling, therapy, suicide prevention, medication management, crisis intervention, and substance abuse counseling, while the Sheriff's Department custodial deputies maintain security and safety in the jail's housing units.

After filling out a mental health questionnaire, Clouthier was evaluated by Sharlene Hanaway, a Contra Costa County

Mental Health Specialist. Clouthier told Hanaway several times that he was suicidal, and that he wanted to be "unconscious for the rest of his life." Hanaway described Clouthier as "despondent, hopeless, suicidal" and "one of the most suicidal inmates she had ever seen." Hanaway's notes state that Clouthier had made numerous past suicide attempts, including one incident two months earlier that required hospitalization after he cut his wrists. Hanaway's notes reflect that Clouthier had taken medication for several years, but that he had ceased doing so two and a half years ago.

Hanaway placed Clouthier in a "safety cell" in the intake area of the jail. She had him wear a suicide smock, a stiff garment that cannot be fashioned into a noose. She restrained his ankles and began noting his status every fifteen minutes in an Observation Log. She also approached the mental health workers, including Margaret Blush, and the deputies in the intake area, and advised them that Clouthier was "truly suicidal" and "the real deal."

Hanaway spoke with Clouthier periodically throughout the morning of July 27, "talking to him and making sure he was okay and [asking] what his state of mind was." By that afternoon, Clouthier informed Hanaway that he was not feeling suicidal anymore. Hanaway did not trust him, however, noting "he had multiple suicide attempts before, and given his history and his despondency, his hopelessness, you just don't recover that quickly." Hanaway convinced Clouthier to consider medication, and she called for an emergency consultation with Dr. Douglas Hanlin, a psychiatrist. Hanlin prescribed Effexor XR for Clouthier's depression and Trazodone to help him sleep. Hanlin also recommended that Clouthier be placed in M-Module, a housing section for unstable inmates, and that he subsequently be reevaluated to determine whether a short-term involuntary hospitalization would be necessary.

Around 2 p.m., Hanaway transferred Clouthier to Observation Room 7, one of the rooms in M-Module equipped with

large windows through which the Sheriff's deputies can monitor the occupant. Hanaway spoke to Matt Foley, the deputy on duty in M-Module at the time, and asked Foley whether there was room for Clouthier in the M-Module. She told Foley that Clouthier was suicidal, had been suicidal all day long, "had numerous prior attempts," and needed to be on 15-minute checks. As documented in the Observation Log, Foley checked on Clouthier every fifteen minutes for the next five hours, until Clouthier was taken off the Observation Log.

Before she left her shift, Hanaway gave a copy of her notes to Blush and told her that Clouthier "had been very suicidal throughout the day and that [Hanaway] felt that he needed to be in the observation room and that he needed to be observed and [Blush] needed to look in on him." Hanaway left MDF around 6:30 p.m. on July 27.[1]

Around 7 p.m. the same evening, Blush went up to M-Module and spoke with Clouthier for "[l]ess than five minutes." She informed Foley that Clouthier could be given regular prison clothes and a blanket but that he was not to be given any utensils or personal hygiene items. She also told Foley that Clouthier could be removed from the fifteen minute Observation Log, and she made an entry to that effect in the log. Blush testified that she took Clouthier off the Observation Log because in her view, the risk of suicide had decreased, although she was uncertain whether it had disappeared. She explained that her "clinical judgment was that Robert was improving, would benefit from having normal jail clothes and bedding and could be further evaluated by mental health staff the following day." However, Blush also agreed that Clouthier was not "out of the woods" yet.

Blush claims she told Foley to keep Clouthier in the Observation Room, and Foley indicated he understood and responded "I'm sitting right here." Foley disputes this. He tes-

---

[1]Hanaway did not return to work until after Clouthier's suicide.

tified that Blush did not instruct him to keep Clouthier in the Observation Room. Later, he testified that he could not remember if Blush directed him to keep Clouthier in the Observation Room, but that if she had so directed him it would have been something to which he would have paid attention. Foley did not write down Blush's alleged instruction to keep Clouthier in the Observation Room in the "Red Book," a log the deputies kept to inform one another of important events, or otherwise communicate an instruction to the next deputy on duty.

Regardless of whether Blush instructed Foley to keep Clouthier in the Observation Room, Foley did not move Clouthier from the room, and he remained there when Foley left work on July 27. Foley returned on July 28 to find Clouthier was still in the Observation Room. Per M-Module standard practice, Foley continued to check on Clouthier every thirty minutes. Foley ended his duty at 9:30 pm on the evening of July 28 with Clouthier still in the Observation Room. Foley did not return to work until August 1st, when Clouthier had already been moved into the M-Module general population.

The next day, on July 29, Victoria Brown, another mental health specialist, observed Clouthier in Observation Room 7 during dinner hour for three to five minutes. She "understood that he was suicidal," and asked him some questions to evaluate his mental state. She observed that "while he appeared calm . . . he still appeared acute to me, his affect or what I could see on his face suggested that he was still . . . not feeling well." Therefore, she did not think that "trying to have a lengthy conversation would be appropriate at that time." She further testified that she was not "overly concerned with [Clouthier's] situation, given the background information I had on him. He was calm and looked emotionally drained. He looked like he needed rest more than anything." Based on her "over 37 years of working with potentially suicidal mental health patients," Brown's clinical evaluation "was that he was not actively suicidal at the time." Although she "did not feel

the need to put him back on the observation log," she did "feel he would benefit from additional time in the observation room." She did not make any notes on Clouthier's medical chart, "as the situation was status quo." She did not confer with any deputies or Mental Health staff regarding her observations.

That evening, Deputy Eric Steele began his shift on M-Module. The other deputies told him that earlier in the week Clouthier had been placed in Observation Room 7 "for being a danger to himself," and since then had been "taken off the Observation Log but had not yet been moved" from the Observation Room. Steele reviewed the Red Book, but he did not see any information about why Clouthier was in the Observation Room. Nor did Steele see any of Clouthier's medical records kept by Mental Health. Clouthier remained in the Observation Room from July 29 through July 31.

On July 31, the Red Book stated that Clouthier had refused free time at 10:21 a.m., refused lunch at 11:36 a.m., and refused dinner at 5:11 p.m. Steele testified that the Red Book notation about Clouthier skipping his free time did not raise a "red flag" because it was not unusual for inmates not to come out in the morning because they want to sleep. Steele testified that when an inmate skips meals he would "keep a closer eye on him," and stated:

> [A]fter speaking with [Clouthier] all weekend he explained his reasons to me . . . . He told me he wasn't hungry. He told me he was trying — he just wanted to catch up on his sleep, and he was okay. So after talking with him the whole weekend, it wasn't the general red flag. If he refused to talk to me or something like that, that might — that would make me think differently than I was about him.

Steele testified further that:

I'd been talking to Mr. Clouthier throughout the weekend, seeing how he's doing, where his head was at, talked to him about what he was going to do once he got out of the observation room and what could help him progress. And after that, I was just looking for inmates that would be able to help him through that.

. . .

[H]e was off an observation log, so to me that tells me that he's not a danger to himself. He had been talking to me during the week. He expressed wanting to come out for recreation with the other inmates, which he had opportunity to come out. Yeah, he had a positive outlook on wanting to come out, waiting to just get out of the room and get more mobile and get more interaction, yes.

Captain David Pascoe, the Deputy Supervisor, testified that, based on the Sheriff's Department's training, he would expect a deputy to ask Mental Health to evaluate an inmate that was skipping meals and free time. Steele did not inform Mental Health of the Red Book entries.

Sometime between 12:00 a.m. and 6:30 a.m. on August 1, Steele received a call from Sergeant Yates, who stated that he needed Observation Room 7. Steele called Mental Health Services to ask whether Clouthier should be moved, but no one answered because Mental Health staff do not work the graveyard shift. Steele testified that he had been looking for an appropriate roommate for Clouthier before the phone call and that, because Clouthier "was off an observation log . . . he's not a danger to himself." Steele then moved Clouthier into the M-Module general population and placed him in a cell with inmate Marc Watkins.

Foley reported back for duty the afternoon of August 1. He testified that he had no reason to question Clouthier's transfer

from Observation Room 7 into the general population. According to Watkins, after dinner that evening, Clouthier sat on his bunk and tied his sheet into a knot on one end. At 7:15 p.m., Foley went to Clouthier's cell to let Watkins out for recreational time. Foley told Clouthier that he could not come out right then, but that Foley would return to take him out. Watkins testified that, "when [Watkins] left the room [he] saw the sheet, still knotted, sitting on the edge of the bed, hanging over slightly. Dep[uty] Foley didn't say anything about the sheet, but he sure should have been able to see it." Foley testified that he did not see the knotted sheet, but rather that he saw Clouthier "lying on his bunk, with the sheets pulled around him. This is the way many if not most inmates spend a great deal of their time in the cells on M-Module."

Roughly thirty minutes later, at 7:42 p.m., Foley and a nurse went to Clouthier's cell. They discovered him hanging by the neck from the knotted sheet. Foley administered CPR, and Clouthier was taken to the County Hospital. After being removed from life support ten days later, Clouthier died.

Clouthier's parents filed suit under 42 U.S.C. § 1983 against Blush, Steele, Foley, and the County. The Clouthiers alleged that the individual defendants violated Clouthier's constitutional right to due process under the Fourteenth Amendment due to the officials' deliberate indifference to Clouthier's serious medical needs. They also alleged that Clouthier's death was caused by the County's established policies, its failure to train employees, and its ratification of the officials' illegal actions. After discovery, the defendants moved for summary judgment, which the district court granted on the merits as to each defendant. This timely appeal followed.

## II

Summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). We

must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

"Although the district court did not reach the issue of qualified immunity we may do so where it is clear from the record before us." *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1201 (9th Cir. 2009). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted)). In considering a claim of qualified immunity, the court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 816. Whether a right is clearly established turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 822 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)).

On appeal, the Clouthiers raise three arguments. First, they claim that the district court made a legal error by applying the "deliberate indifference" test articulated by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). Second, they argue that even if the deliberate indifference test is applicable here, there was a genuine issue of material fact as to whether the individual defendants were liable under that test. Further, the Clouthiers argue that Robert Clouthier's rights in this context were clearly established, so the individual defendants were not entitled to summary judgment on the ground of qualified immunity. Finally, they argue that the district court erred in concluding that the Clouthiers had not established a genuine issue of material fact as to the County's lia-

bility on account of its deficient polices. We consider these issues in turn.

### III

We first consider the Clouthiers' argument that the district court erred in holding that liability could be imposed on the individual defendants only if they had a " 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302-03).

**[1]** We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a "deliberate indifference" standard. *See, e.g.*, *Lolli v. County of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003) (applying the "deliberate indifference" standard to a diabetic pretrial detainee's claims of failure to provide care for serious medical needs); *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 & n.9 (9th Cir. 2002) (applying the "deliberate indifference" standard to the claims of a mentally ill pretrial detainee who died in custody); *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 & n. 2 (9th Cir. 1988) (applying the "deliberate indifference" standard to a § 1983 claim by the mother of a pretrial detainee who committed suicide in detention, and explaining that "the fourteenth amendment due process rights of pretrial detainees are analogized to those of prisoners under the eighth amendment"), *vacated on other grounds*, 490 U.S. 1087 (1989), *opinion reinstated*, 886 F.2d 235 (9th Cir. 1989).

**[2]** This approach is grounded in Supreme Court precedent. In *Bell v. Wolfish*, the Supreme Court held that pretrial detainees had a due process right not to be punished. 441 U.S. 520, 535 & n.16 (1979). The Court explained that, "what *is* at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment . . . ." *Id.*

at 534 (emphasis in original); *see id.* at 535 ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."). The key question "in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," is whether the restrictions evince a punitive purpose or intent. *Id.* at 538-39.

The Supreme Court has explained the meaning of "punitive intent" in the context of its Eighth Amendment jurisprudence. For a prisoner to establish "cruel and unusual punishment," he must show both an objective component, addressing whether a deprivation was sufficiently serious to be "cruel and unusual," and a subjective component, addressing whether correction facility officials acted with "a sufficiently culpable state of mind," so that the condition of confinement may be deemed to be "punishment." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). With respect to the second component, the Court explained, "[i]f the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify" as punitive. *Id.* at 300 (emphasis in original).

In cases claiming an Eighth Amendment violation "based on a failure to prevent harm," the first, objective component is met if the inmate shows that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The second component, punitive intent, is met if the claimant shows that the detention facility official's "state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* This is a subjective test in that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "[A]n official's failure to alleviate a significant risk that he should have

perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838; *see also Gibson*, 290 F.3d at 1188 ("If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." (citing *Jeffers v. Gomez*, 267 F.3d 895, 914 (9th Cir. 2001))).

**[3]** In light of the Supreme Court's rulings that conditions of confinement violate pretrial detainees' Fourteenth Amendment rights if the conditions amount to punishment, *Bell*, 441 U.S. at 535, and that failure to prevent harm amounts to punishment where detention officials are deliberately indifferent, *Farmer*, 511 U.S. at 834, we have concluded that the "deliberate indifference" standard applies to claims that correction facility officials failed to address the medical needs of pretrial detainees. *See, e.g.*, *Lolli*, 351 F.3d at 418-19; *Gibson*, 290 F.3d at 1188 n.9; *Cabrales*, 864 F.2d at 1461 & n.2. Although we have noted that the Eighth Amendment may provide "a minimum standard of care" for determining the rights of pretrial detainees, *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003), neither we nor the Supreme Court have departed from the standard set forth in *Bell* and *Farmer* for considering pretrial detainees' claims that government officials violated their Fourteenth Amendment rights by failing to prevent harm. *See, e.g.*, *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment . . . we apply the same standards.").

**[4]** In this case, Clouthier was a pretrial detainee confined at MDF in connection with battery and vandalism charges. Accordingly, under *Bell* and our cases, we must consider whether Clouthier was subjected to punishment. This requires us to inquire into the subjective component of punishment, that is, whether Foley, Steele, or Blush acted with deliberate indifference as defined in *Farmer* and our cases.

The Clouthiers argue, however, that the deliberate indifference standard is not applicable here. Relying on *Mink* and *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004), the Clouthiers contend that mentally ill pretrial detainees are entitled to greater protection under the Fourteenth Amendment. The Clouthiers invite us to adapt the standard suggested by *Youngberg v. Romeo*, 457 U.S. 307 (1982), and hold that mentally ill detainees have a constitutional right to mental health care that does not substantially depart from accepted professional judgment, practice, or standards. Under such a standard, the Clouthiers could prosecute their § 1983 action without carrying the burden of showing that the individual defendants subjectively acted with deliberate indifference to a substantial risk of serious harm to Clouthier.

**[5]** We must decline this invitation. The cases cited by the Clouthiers considered the substantive due process rights of individuals detained by the state for the purpose of addressing issues associated with their mental incapacity; they do not address the liberty interests of pretrial detainees who are confined to ensure their presence at trial, as in *Bell.* In *Youngberg*, the Court held that a profoundly mentally retarded man who had been civilly committed to a state mental institution had a liberty interest in "reasonable conditions of safety and freedom from unreasonable restraints." 457 U.S. at 321. Balancing such liberty interests against the state's legitimate interests in managing the institution, the Court held that the patient's interests would be adequately protected if the state addressed them in a reasonable manner as determined by a professional decision maker. *Id.* at 322-23. The Court did not suggest that such rights were applicable to pretrial detainees. Rather, it cited *Bell* with approval, noting it had similarly balanced a pretrial detainee's liberty interest against the state's interest and the Court there had "upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment." *Id.* at 320.

Nor are subsequent Ninth Circuit cases weighing the liberty interests of mentally incapacitated plaintiffs against the legiti-

mate interests of the state applicable in this context. *See Mink*, 322 F.3d 1101, *Jones*, 393 F.3d 918. In *Mink*, for example, a state law required criminal defendants who were declared mentally incapacitated and unable to stand trial to be committed to a state mental hospital for the purposes of evaluation, treatment, and restoration. *Id.* at 1106. We held that the state mental hospital violated those defendants' constitutional rights by not accepting their transfer from county jails on a timely basis. *Id.* at 1121. We determined that there was no "legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months," and in fact the state hospital's delay "undermine[d] the state's fundamental interest in bringing the accused to trial." *Id.* In *Jones*, we held that an individual detained awaiting civil commitment proceedings was, at a minimum, entitled to the rights of a civilly committed mentally retarded person in *Youngberg* and a pretrial detainee in *Bell*. *Jones*, 393 F.3d at 932. Accordingly, we ruled that holding a civil detainee under conditions similar to or more restrictive than the conditions imposed on a criminal detainee constituted "punishment," and therefore violated the civil detainees' Fourteenth Amendment rights. *Id.*

In sum, the cases cited by the Clouthiers involve plaintiffs who were differently situated and who enjoyed different rights from the plaintiffs considered in *Bell*. Moreover, these cases involved distinct state interests. Because none of these cases signal a departure from *Bell*, we do not consider them persuasive here. Accordingly, we must evaluate the Clouthiers' claim that Blush, Steele, and Foley violated Clouthier's due process rights under the deliberate indifference standard articulated in *Farmer* and applied by our cases in the context of pretrial detainees.

IV

Even under the deliberate indifference standard, however, the Clouthiers argue that Blush, Steele, and Foley are not enti-

tled to summary judgment. To defeat a motion for summary judgment by the individual defendants, the Clouthiers must show a genuine issue of material fact as to both prongs of the deliberate indifference test: (1) whether Clouthier was confined under conditions posing a "substantial risk of serious harm" and (2) whether the officers were deliberately indifferent to that risk. *Lolli*, 351 F.3d at 420. Here, defendants do not contest that the conditions of Clouthier's confinement posed "a substantial risk of serious harm." *Id.* at 420. Rather, they dispute whether the Clouthiers presented "evidence from which a reasonable jury could conclude that any of the individual officers knew of and were deliberately indifferent to this substantial risk of serious harm." *Id.* at 420. We examine, in turn, the Clouthiers' claims against Blush, Steele, and Foley. We view the evidence in the light most favorable to the non-moving party. *See Olsen*, 363 F.3d at 922. In order to ensure that our examination of Clouthier's claims against each defendant rests on a resolution of the facts most favorable to the Clouthiers, the analysis below must occasionally resolve factual disputes regarding the same incident in different ways.

A

**[6]** Viewing the evidence in the light most favorable to the Clouthiers, a rational jury could conclude that Blush was "on notice" of Clouthier's suicidal condition and that she actually "inferred from this information that [Clouthier] was at serious risk of harm if he did not receive" proper care. *Lolli*, 351 F.3d at 420. Blush was given a copy of Hanaway's notes, which reflected that Clouthier had told Hanaway he was suicidal and that he had previously attempted suicide. The notes also stated that Clouthier was put in a suicide smock, was to be "constantly monitored throughout the day to ensure his safety," and that Mental Health would gather more of his history. Hanaway also personally informed Blush that she thought Clouthier was truly suicidal, that he was going to try to kill himself, and that he was the "real deal." Hanaway emphasized that Clouthier "had been very suicidal throughout the day and

that [Hanaway] felt that he needed to be in the observation room and that he needed to be observed and [Blush] needed to look in on him."

**[7]** In addition to Hanaway's notes and personal warnings, which give rise to the inference that Clouthier faced a substantial risk of serious harm, the Clouthiers adduced evidence that Blush actually inferred that Clouthier was suicidal. After meeting with Clouthier for "[l]ess than five minutes," Blush told Foley that Clouthier should not have access to utensils or other objects because she "felt it was best that some limitations be placed on his access to anything." Blush also agreed that Clouthier was not "out of the woods" yet and that his condition could "go either way." She testified she was "uncertain" whether his suicidality had disappeared. Yet, Blush removed Clouthier from the Observation Log, told the deputies he could be given regular clothes and regular bedding, failed to instruct Foley to keep Clouthier in the Observation Room,[2] and neglected to determine if additional care was needed. From this circumstantial evidence, a jury could reasonably infer that Blush knew of Clouthier's depressive, suicidal condition and need for mental health treatment, and "also knew of the risk of harm that he faced if denied medical attention." *Lolli*, 351 F.3d at 421; *see also Farmer*, 511 U.S. at 843 n.8 ("While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him, . . . he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . ."). Accordingly, resolving factual disputes in favor of the Clouthiers, "the circumstances suggest that [Blush] had been exposed to information concerning the risk and thus 'must have known' about it . . . ." *Farmer*, 511 U.S. at 842. Therefore, there exists a genu-

---

[2]Blush claims she did instruct Foley to keep Clouthier in the Observation Room.

ine issue of material fact as to whether Blush was deliberately indifferent to a substantial risk of harm to Clouthier.[3]

In light of this conclusion, we must consider whether Blush is entitled to qualified immunity. This inquiry involves the question whether "the law governing [Blush's] conduct was clearly established" and whether "a reasonable state official [could] have believed [Blush's] conduct was lawful." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). Blush argues that Clouthier's constitutional rights in this context were not clearly established at the time of Blush's alleged misconduct. According to Blush, although it was clear in 2005 that pre-trial detainees had a right to mental health care, the contours of that right were vague at that time, and she was not on notice that her conduct was unlawful.

**[8]** We disagree. In 1988, we affirmed a jury verdict imposing § 1983 liability on a municipality and its official policymaker for deliberate indifference to a pretrial detainee's mental health needs that resulted in the detainee's suicide. *See Cabrales*, 864 F.2d at 1461 & n.2; *see also Gibson*, 290 F.3d at 1196, 1187 (evaluating individual deputies' liability under the deliberate indifference standard where pretrial detainee alleged insufficient medical care). Blush, a mental health specialist, was tasked with caring for a pretrial detainee who had recently expressed suicidal intent and whose suicidality had been described to her by a fellow mental health professional as "the real deal." In light of her understanding that Clouthier was not "out of the woods" yet, and in light of the clearly established law at the time, a reasonable mental health professional could not have thought it was lawful to remove key sui-

---

[3]The district court did not reach the issue of causation, and neither of the parties briefed the issue. *See White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990) (to prevail on a § 1983 claim under a deliberate indifference theory, plaintiff must prove that the official's actions were both the actual and proximate cause of plaintiff's injuries). Accordingly, we do not reach this issue here.

cide prevention measures put in place by a prior Mental Health staff member. Accordingly, taking the evidence in the light most favorable to the Clouthiers, Blush is not entitled to qualified immunity.

B

**[9]** As to Steele, we conclude that the Clouthiers' evidence is insufficient to allow a reasonable jury to conclude that Steele knew Clouthier was subject to a substantial risk of serious harm when he moved him to the general population. The Clouthiers argue that a jury could find that Steele must have known of the risk to Clouthier "from the very fact that the risk was obvious." They point out that, on July 31, Steele knew that Clouthier had recently refused to eat both lunch and dinner, and had refused to partake in free time. Further, the Clouthiers note that Steele had been trained to recognize the signs of at-risk detainees by looking for individuals illustrating subtle signs of self-destructive intent, such as loss of appetite or withdrawal.

**[10]** The Clouthiers' argument is unavailing. Here, the evidence, comprised of the Red Book entries and Steele's prior training, does not create an inference that the substantial risk of serious harm to Clouthier was so obvious that Steele "must have known" of it. Unlike Blush, who was personally informed of Clouthier's suicidal proclivities, Steele knew only that the Red Book entries noted Clouthier's missed meals and free time. Steele testified that when he reported to work on July 28, "[t]hey explained to me that earlier in the week [Clouthier] was placed in there for being a danger to himself, and since then was taken off the observation log and had . . . yet to be moved out of there." As to the Red Book entries, Steele noted that, when an inmate skips meals, he would "need to keep a closer eye on him," and indeed Steele followed up with Clouthier, "speaking with him all weekend." After inquiring multiple times into Clouthier's status, Steele noted that Clouthier "had a positive outlook on wanting to

come out, waiting to just get out of the room." Moreover, Brown, the mental health specialist who evaluated Clouthier hours before Steele first came on duty, testified that while Clouthier looked "acute," "fatigued, somewhat shell-shocked," he also appeared to be "calm" and "emotionally drained," as if he "needed rest more than anything," and her clinical evaluation was that "he was not actively suicidal at the time," although he "would benefit from additional time in the observation room." There is no evidence that Brown communicated her observations to Steele, or that he saw any notes indicating Clouthier was acting strangely. Moreover, given Brown's evaluation, there is no basis for concluding that it was obvious that Clouthier was suicidal. Instead, on July 31, neither Steele nor another deputy "had a firm understanding of why" Clouthier was still in the Observation Room. Accordingly, the circumstantial evidence is too limited for a reasonable factfinder to "conclude that [Steele] knew of a substantial risk from the very fact that the risk was obvious."[4] *Farmer*, 511 U.S. at 842.

[11] In the absence of a risk so "obvious" that Steele must have drawn an impermissible inference, the Clouthiers were required to adduce evidence that raised a genuine issue of

---

[4]In *Conn v. City of Reno*, 572 F.3d 1047 (9th Cir. 2009), we reversed a district court's grant of summary judgment in favor of two officers, because there was "sufficient circumstantial evidence to create a genuine issue of fact regarding defendants' subjective awareness" of a serious medical need. *Id*. at 1057. In that case, the two officers were transporting a detainee when they observed the detainee wrap a seatbelt around her neck and scream that she would kill herself. The officers neglected to report the incident, because they interpreted it as a "belligerent" and "uncooperative" attempt "to manipulate the situation." *Id*. at 1052. We held that a "reasonable jury could conclude that the officers' knowledge of [the detainee's] mental and emotional instability, coupled with their observation of her dangerous behavior, in fact produced a subjective awareness." *Id.* at 1057. Here, in contrast, the Clouthiers adduced no evidence showing Steele observed suicidal actions, heard statements of a suicidal nature, or witnessed other evidence of Clouthier's suicidal intent of the obvious kind exhibited in *Conn*.

material fact demonstrating Steele was subjectively aware of the risk to Clouthier. Because the Clouthiers did not do so, the evidence was insufficient to allow a jury to conclude "that [Steele's] conduct violated a constitutional right," *Estate of Ford*, 301 F.3d at 1050, and summary judgment in Steele's favor was therefore proper.

C

**[12]** As to Foley, the evidence adduced by the Clouthiers is insufficient to allow a jury to conclude that Foley knew Clouthier was suicidal and deliberately ignored that risk. The Clouthiers argue that Foley knew of the risk facing Clouthier because he had initially been informed by Hanaway of Clouthier's suicidality and had been told by Blush to continue certain restrictions on Clouthier. Moreover, the Clouthiers claim that Foley saw the knotted sheet in Clouthier's cell. Given Foley's knowledge that Clouthier was suicidal, the Clouthiers argue that Foley deliberately failed to take steps to address the risk.

We again must disagree. The record does not include sufficient direct or circumstantial evidence to create a genuine issue of material fact as to whether Foley was subjectively aware of a substantial risk of harm to Clouthier and that he deliberately ignored that risk.

**[13]** Foley had two different encounters with Clouthier. The first occurred during the period from July 27, when Hanaway transferred Clouthier to the M-Module, until July 28, when Foley's shift ended. There is no evidence that Foley was subjectively aware that Clouthier was actively suicidal at the time Foley left his shift. Foley's information about Clouthier's condition was limited. At the time Hanaway transferred Clouthier, she told Foley that Clouthier was suicidal, had "numerous prior attempts" at suicide, and needed to be on 15-minute checks. But Foley had no other information regarding Clouthier's mental state; Foley did not have access to

Hanaway's notes or to Clouthier's medical chart, and he had not seen Clouthier's health questionnaire detailing his mental health history. When Blush took Clouthier off the Observation Log, she told Foley to give Clouthier his regular clothes and bedding but not utensils or personal hygiene items, and instructed Foley to keep Clouthier in the Observation Room.[5] There is no evidence that Blush shared her perceptions of Clouthier's mental state with Foley. To Foley, Clouthier's removal from the Observation Log meant he could be moved out of an Observation Room and into M-Module's general population. In Foley's experience, inmates having extremely serious mental health issues would be transferred to the County's Psychiatric Emergency Services.

Nor does the evidence indicate that Foley's understanding of Clouthier's situation was willful ignorance of the obvious: Blush testified that she took Clouthier off the Observation Log because she believed the risk that Clouthier would commit suicide had decreased, although she was uncertain whether it had disappeared. On July 29, Brown visited Clouthier in the Observation Room and determined, based on her 37 years of clinical experience, that Clouthier was not actively suicidal.

[14] Although Foley did not note Blush's instructions to keep Clouthier in the Observation Room in the Red Book or communicate these instructions to other deputies, Foley's behavior towards Clouthier was not otherwise indicative of deliberate indifference. Foley followed Hanaway's instructions to check on Clouthier every 15 minutes until Blush released Clouthier from the Observation Log. Moreover, Foley complied with Blush's instructions to keep Clouthier in the Observation Room; indeed, Clouthier did not leave that room until four days after Foley's shift ended.

---

[5]As noted earlier, Foley testified that he did not receive this instruction.

**[15]** Under these facts, there is insufficient evidence to establish that Foley was subjectively aware that his failure to communicate Blush's instructions to other deputies constituted a substantial risk of serious harm to Clouthier, and deliberately ignored that risk. *See Farmer*, 511 U.S. at 844 ("Because . . . prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety . . . . Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.").[6] Although Foley's failure to communicate Blush's instructions may have been negligent, in the absence of evidence that Foley knew Clouthier was in substantial danger, it cannot be said that Foley acted with deliberate indifference. *Id.* at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").[7]

---

[6]The dissent argues that whether Foley deliberately ignored a substantial risk of harm to Clouthier is a question that should be decided by a jury. Dissent at 1154. We disagree. Even if a jury could reasonably conclude that Blush's instruction "communicated to Foley that Clouthier still posed a substantial risk of serious harm to himself," Dissent at 1154, it does not follow that a jury also could conclude that Foley showed deliberate indifference to this risk. Rather, Foley acted reasonably under the circumstances by following Blush's instructions and keeping Clouthier in the Observation Room (where he remained for three more days). *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty . . . is to ensure 'reasonable safety' " (quotation marks omitted)).

[7]The dissent "fail[s] to understand why we should rule as a matter of law that Foley's failure to pass that information on to subsequent shifts was mere negligence." Dissent at 1155. The answer lies in *Farmer*'s pronouncement that "an official's failure to alleviate a significant risk that he

When Foley returned on August 1, Clouthier had been moved into M-Module's general population. On this second shift, Foley "noted nothing unusual" and "saw nothing in [Clouthier's] behavior or in his record that [would] lead [Foley] to believe that [Clouthier] was at risk for suicide." The Clouthiers adduced testimony from Clouthier's cell mate, Watkins, that when Foley took Watkins out for free time on August 1, Foley "sure should have been able" to see the knotted sheet hanging over the edge of Clouthier's bed. But Watkins did not allege that Foley had in fact seen the knotted sheet, and the Clouthiers adduced no evidence to that effect.[8] Foley's testimony that he did not see the knotted sheet is therefore undisputed. Again, there is insufficient circumstantial evidence that Foley was subjectively aware of a substantial risk of harm to Clouthier and deliberately ignored it. *See Gibson*, 290 F.3d at 1188. Because "the record taken as a whole could not lead a rational trier of fact to find for" the Clouthiers, *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), summary judgment in favor of Foley was proper.

V

We next turn to the Clouthiers' argument that the district court erred in granting summary judgment in favor of the County. Although the Clouthiers frame their argument in different ways, their claim amounts to the assertion that the

should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." 511 U.S. at 838. Here the record provided no evidence of Foley's subjective awareness that failure to pass on Blush's instruction created a substantial risk of harm. Even if Foley should have perceived this risk, his failure to do so does not rise to "the infliction of punishment." *Id.*

[8]Nor was this a situation like that which took place in *Conn,* where there were "warning signs that [would be] difficult for any observer to miss." *Conn*, 572 F.3d at 1057.

County's procedures for dealing with mentally ill detainees were deficient, that the County knew of these deficiencies, and that the County's deliberate indifference to these deficiencies resulted in their son's death.

We first examine the legal framework for this claim. The Clouthiers may recover from the County under § 1983 for failure to prevent harm to Clouthier under one of three theories of municipal liability. First, a local government may be held liable "when implementation of its official policies or established customs inflicts the constitutional injury." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J. concurring); *see also Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (stating that plaintiffs may "establish municipal liability by demonstrating that . . . the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity" (internal quotation marks omitted)). We have referred to these sorts of local government conduct as acts of "commission." *Cabrales*, 864 F.2d at 1461.

Second, under certain circumstances, a local government may be held liable under § 1983 for acts of "omission," when such omissions amount to the local government's own official policy. *Id.* ("[A]cts of omission, as well as commission, may constitute the predicate for a finding of liability under section 1983."). To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to "deliberate indifference" to a constitutional right. This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). For example, if police activities in arresting fleeing felons "so often violate constitutional rights that the need for further training must have been plainly obvi-

ous to the city policymakers," then the city's failure to train may constitute "deliberate indifference." *Id.* at 390 n.10.[9]

"Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389. And only under such circumstances does the failure to train constitute "a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 390. Although this is a high standard, the Supreme Court warned against diluting the requirement that a local government can be held liable only for an action or inaction that amounts to an official policy:

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*. It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

---

[9]The "deliberate indifference" standard for municipal liability set forth in *Canton* is different from the subjective "deliberate indifference" standard set forth in *Farmer*. As explained in *Farmer*, the "*Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice," is an objective standard; however, such an objective standard "is not an appropriate test for determining the liability of prison officials." *Farmer*, 511 U.S. at 841.

*Canton*, 489 U.S. at 392 (internal citations omitted).

**[16]** Third, a local government may be held liable under § 1983 when "the individual who committed the constitutional tort was an official with final policy-making authority" or such an official "ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal quotation marks and citations omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24, 127 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik,* 485 U.S. at 127 (1988). "There must, however, be evidence of a conscious, affirmative choice" on the part of the authorized policymaker. *Gillette*, 979 F.2d at 1347. A local government can be held liable under § 1983 "only where 'a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " *Id.* (quoting *Pembaur*, 475 U.S. at 483-84 (plurality opinion)).

The Clouthiers identify two principal deficiencies in the County's procedures. First, they allege that the custodial staff did not comply with the County's written policy requiring mental health staff approval for moving a detainee into the general population. Compounding this problem, the Clouthiers allege, was an inadequate system of communication between mental health staff and custodial staff regarding when a detainee could be moved from an observation cell. Second, the Clouthiers allege that the County's jail was understaffed, resulting in mental health staff failing to observe mentally ill detainees with sufficient frequency to ensure their safety. The Clouthiers make the additional argument that the County ratified the constitutional violations of its employees.

A

**[17]** To evaluate the claim that County employees did not rigorously implement the policy governing movement of an inmate out of an observation cell into the general population, we must begin with the policy itself. The County's written policy, Sheriff's Policy 13.10(II)(B) states, in pertinent part:

> 2) If the inmate is not referred to the In-Patient Psychiatric Unit by medical staff, one of three alternative actions will be employed . . . .
>
> a. Open observation
>
> . . .
>
> If Mental Health staff determines the inmate can be housed with other inmates, the inmate may be housed at MDF or WCDF and shall be based on Mental Health staff's recommendation.
>
> . . .
>
> Deputies will report any changes in behavior to Medical/Mental Health staff.

While this language does not expressly preclude deputies from moving inmates into the general population without mental health staff approval, the language suggests that deputies would ordinarily obtain a recommendation from mental health staff before making such a move.

Other evidence in the record indicates that an inmate is moved into general population through a consultation between mental health staff and custodial staff. Captain Pascoe testified that "movement of inmates on M Module is a consultation between health services staff who's [sic] assigned there and the deputy . . . . If an officer had an indi-

vidual in one regular housing cell and wanted to move them to another, they can facilitate that unless they have some indication that there would be a problem in doing so." Similarly, Kramer, the head of Detention Health Services, testified that, when deputies are concerned about the directions they receive from mental health staff, they must "get another opinion," "ask again the next day," or otherwise follow "whatever is within their procedures" in order to move the inmate. The record indicates that Steele, the deputy who moved Clouthier into the general population, believed that mental health staff had approved the move. Viewing the evidence in the light most favorable to the Clouthiers, this misapprehension was caused by Foley's failure to document Blush's instructions, Steele's misunderstanding of the significance of removing an inmate from the Observation Log in this case, and the unavailability of mental health staff on the late shift.

**[18]** Drawing all inferences in favor of the Clouthiers, a reasonable jury could conclude that the custodial and mental health staff were deficient in their implementation of the County's written policy, because the custodial staff failed to ensure they had the approval of mental health staff before moving Clouthier. However, that does not create a triable issue of fact on the question whether the County itself is liable for this deficiency. There is no evidence that the County had a longstanding custom or practice of moving detainees from an observation cell into general population without consultation with mental health staff or contrary to their recommendations. Nor is there evidence of a longstanding custom or practice of miscommunication between mental health staff and custodial staff. There is no evidence that the County was on actual or constructive notice that deficiencies in the implementation of its policy would likely result in a constitutional violation.

Moreover, nothing in the record indicates that improper transfers of suicidal inmates happened so frequently that the need for corrective measures "must have been plainly obvious

to the city policymakers." *Canton,* 489 U.S. at 390 n.10. In fact, the evidence in the record indicates that between 2001 and 2006, out of more than 175,000 inmates processed at the County's Martinez Detention Facility, 158 suicide attempts were discovered and only six inmates succeeded in committing suicide.[10] The County's expert testified that this suicide rate is "far lower than the statewide average, and far lower than the rate in jails in most counties with similar population sizes." Not only did the Clouthiers fail to adduce evidence of a pattern of repeated tortious conduct by County staff, but they also failed to adduce evidence of even a single other suicide resulting from the improper transfer of an inmate from an observation cell into the general population.

**[19]** The Clouthiers point to the affidavit of an expert, who opined, based on a review of the incident, that the mental health staff and custodial staff did not share their records and "did not work together as a team." The expert also stated there was a "disconnect" between the mental health staff and the custodial staff and noted "an inadequacy in training which appears to be purposely indifferent to the mental health needs of pre-trial detainees." But such conclusory assertions are insufficient to avoid summary judgment. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Moreover, the factual basis for the expert's declaration is limited to the "sequence of events and the statements of the participants" surrounding Clouthier's transfer into the general population. The expert's report does not address the key question whether the alleged "disconnect" was so obvious and "the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [local government] can reasonably be said to have been deliberately indifferent" to the problem. *Canton*, 489 U.S. at 390.

---

[10]The suicide rate in the prison system at issue in *Conn* was six in only two years. 572 F.3d at 1053.

In sum, there is no material evidence on the issue of the County's knowledge or the obviousness of the problem.

The Clouthiers also failed to dispute the County's evidence that it was not deliberately indifferent to the needs of mentally ill pretrial detainees. The County had reasonable and well-established written policies for handling detainee mental health needs, which the Clouthiers concede "pass constitutional muster." In addition, the record indicates the County invested considerable resources in developing its policies and training its employees, including requiring all new deputies to complete an eight-week training course and an annual refresher course concerning people with mental disorders. The County's mental health staff are licensed mental health practitioners with graduate degrees, and they receive both on-the-job training and training in new developments in their areas of expertise.

[20] There is little doubt the Clouthiers identified a series of missteps and miscommunications that led to Clouthier's transfer to the general population while he was suicidal. Yet, the Clouthiers have pointed to no evidence that would allow a reasonable jury to conclude the County had caused the improper transfer through deliberate omissions or the implementation of longstanding practices or customs. Accordingly, the Clouthiers have not adduced evidence creating a triable issue of material fact on the crucial issues for County liability.

B

To support their second argument, that the County's practices were deficient because the County lacked adequate mental health staffing, the Clouthiers point to Kramer's testimony: "We don't stipulate how often people are to be seen. We don't have the staff to put in those sorts of guidelines." Drawing all inferences in favor of the Clouthiers, this testimony indicates that the County did not require mental health staff to observe mentally ill detainees on a set schedule, which was inconsis-

tent with its written policy. *See* Sheriff's Policy 10.22(III)(E)(3)(a)(iii) ("Special supervision will be given to any inmate housed in an Observation Room as directed in writing by Medical/Mental Health staff . . . . Medical/Mental Health staff will . . . [r]eview the status of the inmate and update the Housing Unit Deputy every 10 hours so long as the special supervision is required.").

**[21]** However, the Clouthiers failed to adduce evidence that the County was on actual or constructive notice of a problem with mental health understaffing that would amount to a constitutional tort. Further, there was no evidence that this alleged understaffing problem led to repeated violations of inmates' constitutional rights or that the County was aware of and acquiesced in a pattern of constitutional violations. *See Canton*, 489 U.S. at 398 (O'Connor, J., concurring in part and dissenting in part) (stating plaintiff failed to show a triable issue where no evidence indicated "that there had been past incidents of 'deliberate indifference' to the medical needs of emotionally disturbed detainees or that any other circumstance had put the city on actual or constructive notice"). The Clouthiers' claim thus amounts to the argument that "an injury or accident could have been avoided" if mental health staffers had made more frequent observations of Clouthier. *Canton*, 489 U.S. at 391. This is precisely the argument against which the Supreme Court cautioned in *Canton*. *Id.* at 392

C

**[22]** Finally, the Clouthiers argue the County is liable for the constitutional torts of its employees because it ratified the employees' unconstitutional acts. The Clouthiers have not developed their argument on this point, but merely state that the County ratified their employees' conduct by failing to discipline the employees who violated Clouthier's constitutional rights. The Clouthiers adduced evidence that, although Kramer had "the power to impose any discipline on any of the

mental health specialists," he did not do so in response to Blush's actions.[11] This bare allegation is insufficient to create a triable issue of fact. The Clouthiers have not adduced evidence that Kramer was a final policymaker or, even if he were, that he made a conscious, affirmative choice to approve Blush's actions and adopt them as official policy. As we stated in *Gillette*, "[t]o hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law [creating an] end run around *Monell*." 979 F.2d at 1348.

Taking all evidentiary inferences in favor of the Clouthiers, they have at most shown that the County could have better implemented its policies. But as the Supreme Court has indicated, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392. The Clouthiers have not produced sufficient evidence to create a triable issue as to the question whether Clouthier's death was due to a long-standing custom or practice of the County, an omission that amounted to deliberate indifference, or actions the County adopted as policy when it failed to discipline Blush. Holding the County liable for the missteps of its employees in this case would therefore amount to "*de facto respondeat superior* liability," an avenue rejected in *Monell*. *Id.*

VI

We hold that the district court did not err in holding that the individual defendants in this case could not be held liable for failing to prevent Robert Clouthier's suicide unless the defendants had a punitive intent, which in the context of failing to prevent harm requires a determination whether the defendants

---

[11]Victoria Brown was disciplined by the County for her actions.

were deliberately indifferent to a serous risk of harm. *See Bell*, 441 U.S. at 535; *Farmer*, 511 U.S. at 834. Here, the Clouthiers adduced sufficient evidence to create a genuine issue of material fact as to whether Blush was deliberately indifferent to a substantial risk of serious harm to Robert Clouthier, and therefore the district court erred in granting Blush's motion for summary judgment. Because a reasonable official would have known such conduct amounted to a constitutional violation, Blush is not entitled to qualified immunity. The district court did not err in granting summary judgment in favor of Foley and Steele, because the Clouthiers failed to adduce sufficient evidence to create a genuine issue of material fact as to whether Foley and Steele were deliberately indifferent to a substantial risk of serious harm. With regard to their claim against the County, the Clouthiers failed to adduce sufficient evidence to create a genuine issue of material fact as to whether Clouthier's death was due to a long-standing custom or practice, an act of omission that amounted to deliberate indifference, or actions the County adopted as policy when it failed to discipline its employees. Therefore, the district court properly granted the County's motion for summary judgment.[12]

**AFFIRMED in part, REVERSED in part, and REMANDED**.

BLOCK, Senior District Judge, concurring in part and dissenting in part:

I concur in the majority opinion in all respects save one: I cannot agree that Deputy Foley is entitled to summary judgment.

[12]Each party bears its own costs on appeal.

The crux of the plaintiffs' claim against Foley is that he was instructed by Mental Health Specialist Blush not to move Clouthier out of the Observation Room and failed to communicate that instruction to subsequent shifts, either orally or by noting it in the Red Book. With respect to that claim, we must take as true Blush's testimony that she gave such an instruction. Although the majority does so, it concludes that "there is insufficient evidence to establish that Foley was subjectively aware that his failure to communicate Blush's instruction[ ] to other deputies constituted a substantial risk of serious harm to Clouthier, and deliberately ignored that risk." Thus, if a jury were to determine that Blush was not deliberately indifferent because she instructed Foley not to move Clouthier from the Observation Room, the majority has concluded as a matter of law that it could not then consider whether Foley deliberately ignored a substantial risk of harm to Clouthier.

The majority's conclusion with respect to Foley resolves issues that, in my view, should be decided by a jury. As for the "substantial risk" issue, although I appreciate that Foley's training suggested to him that Blush's decision to remove Clouthier from the Observation Log meant that he was no longer a suicide risk, there must have been some reason why Blush also instructed him not to move Clouthier out of the Observation Room (assuming that the jury finds that such an instruction was given); the most obvious candidate is that she still believed him to be suicidal. Thus, a jury could reasonably conclude that Blush's instruction communicated to Foley that Clouthier still posed a substantial risk of serious harm to himself. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

I am also satisfied that a jury could reasonably find that Foley's failure to communicate Blush's instruction crossed

the line between negligence and deliberate indifference. According to Captain Pascoe, deputies were expected to use the Red Book to pass important information to future shifts. A factfinder could surely determine that Blush's instruction was a key suicide prevention measure; indeed, the failure to implement it arguably paved the way for Clothier's suicide. Thus, if a jury were to find that Blush told Foley that Clothier was not to be taken out of the Observation Room, I fail to understand why we should rule as a matter of law that Foley's failure to pass that information on to subsequent shifts was mere negligence. *See Farmer*, 511 U.S. at 847 (official is deliberately indifferent if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").

Finally, if a jury were to determine that Foley was a trained deputy charged with the responsibility of implementing a key suicide prevention measure (i.e., passing on instructions given by a mental health professional that a detainee at risk of suicide was to remain in the Observation Room), qualified immunity would not attach because such an officer could not reasonably have thought it was lawful to do nothing in response to such an instruction. *See Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009) ("When a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety. Thus, the constitutional right at issue here has been clearly established.").