**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JONATHAN MICHAEL
CASTRO,
*Plaintiff-Appellee*,

v.

COUNTY OF LOS ANGELES;
LOS ANGELES SHERIFF'S
DEPARTMENT;
CHRISTOPHER SOLOMON;
DAVID VALENTINE,
Sergeant, aka Valentine,
*Defendants-Appellants.*

No. 12-56829

D.C. No.
2:10-cv-05425-DSF-JEM

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted En Banc March 22, 2016
San Francisco, California

Filed August 15, 2016

Before: Sidney R. Thomas, Chief Judge, and Susan P.
Graber, Ronald M. Gould, Richard A. Paez, Consuelo M.
Callahan, Carlos T. Bea, Milan D. Smith, Jr., Sandra S.
Ikuta, Paul J. Watford, John B. Owens, and Michelle T.
Friedland, Circuit Judges.

Opinion by Judge Graber;
Partial Dissent by Judge Callahan;
Dissent by Judge Ikuta

## SUMMARY[*]

### Civil Rights

The en banc court affirmed the district court's judgment, entered following a jury trial, in an action brought under 42 U.S.C. § 1983 by a pretrial detainee alleging that his due process right to be protected from harm at the hands of other inmates was violated when he was severely beaten and injured in his cell by another inmate.

The en banc court first held that the individual sheriff deputies were not entitled to qualified immunity from suit because plaintiff had a clearly established right to be free from violence from other inmates and substantial evidence supported the jury's findings that the defendants understood that placing plaintiff in a cell with a combative inmate, when the cell had no audio or video surveillance and only occasional monitoring, could lead to serious violence against plaintiff.

Applying *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the en banc court concluded that the evidence supported the jury's findings that the officers knew of the substantial risk of serious harm to plaintiff, which necessarily

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

implied that the jury found that a reasonable officer would have appreciated the risk. The en banc court further concluded that there was sufficient evidence to support the jury's findings that the officers caused plaintiff's injuries by failing to take reasonable measures to address the risk.

The en banc court held that the County of Los Angeles and the Los Angeles Sheriff's Department had notice that their customs or policies posed a substantial risk of serious harm to persons detained in the West Hollywood sobering cell and were deliberately indifferent to that risk. The court held that the custom or policy to use a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only every half hour caused plaintiff's injury. Additionally, substantial evidence supported the jury's finding that the County knew that its cell design might lead to a constitutional violation among its inhabitants.

Dissenting in part, Judge Callahan, joined by Judges Bea and Ikuta, agreed that the judgment against the individual defendants should be affirmed, but she dissented from the affirmance of the judgment against the entity defendants on the grounds that the record in this case showed that the County of Los Angeles did not have a policy or custom that reflected deliberate indifference and caused plaintiff's injuries.

Dissenting, Judge Ikuta, joined by Judges Callahan and Bea, stated that the en banc court misinterpreted *Kingsley v. Hendrickson*, and made a mess of the Supreme Court's framework for determining when pretrial detainees have suffered punishment in violation of their Fourteenth Amendment due process rights.

**COUNSEL**

Melinda Cantrall (argued) and Thomas C. Hurrell, Hurrell Cantrall LLP, Los Angeles, California, for Defendants-Appellants.

John Burton (argued), Law Offices of John Burton, Pasadena, California; Maria Cavalluzzi, Cavalluzzi & Cavalluzzi, Los Angeles, California; and M. Lawrence Lallande, Lallande Law PLC, Long Beach, California, for Plaintiff-Appellee.

David M. Shapiro (argued), Roderick and Solange MacArthur Justice Center, Northwestern University School of Law, Chicago, Illinois; Paul W. Hughes, Mayer Brown LLP, Washington, D.C.; David C. Fathi, ACLU National Prison Project, Washington, D.C.; Peter Eliasberg, ACLU Foundation of Southern California, Los Angeles, California; for Amici Curiae ACLU of Southern California, American Civil Liberties Union, Human Rights Defense Center, National Police Accountability Project, and Roderick and Solange MacArthur Justice Center.

**OPINION**

GRABER, Circuit Judge:

The Los Angeles Sheriff's Department ("LASD") detained Jonathan Castro in a sobering cell in the West Hollywood police station. Several hours later, authorities placed Jonathan Gonzalez, a combative inmate who had been arrested on a felony charge, in the same cell. Castro banged on the cell's window to try to attract attention. Officials at the jail ignored Castro's attempts to seek help. The County of Los Angeles and the LASD had not equipped the cell with audio monitoring, and the cell was checked only sporadically. Within hours of their co-confinement, Gonzalez severely beat and injured Castro. Castro sued individual LASD officials, the County of Los Angeles, and the LASD, under 42 U.S.C. § 1983, for violating his due process right as a pretrial detainee to be protected from harm at the hands of other inmates. After a trial, a jury found all Defendants liable. Defendants timely appeal. We affirm.

FACTUAL[1] AND PROCEDURAL HISTORY

Late in the evening of October 2, 2009, two LASD deputies arrested Castro for public drunkenness, a misdemeanor under California Penal Code section 647(f). Castro, the officers reported, was staggering, bumping into pedestrians, and speaking unintelligibly. The officers arrested Castro for his own safety and transported him to the West Hollywood police station. They placed him in the station's "sobering cell," a fully walled chamber that was

---

[1] We must construe the facts in the light most favorable to the jury's verdict. *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

stripped of objects with hard edges on which an inmate could hurt himself; the cell contained only a toilet and some mattress pads.

Several hours later, authorities arrested Gonzalez on a felony charge after he shattered a glass door with his fist at a nightclub. LASD deputies described Gonzalez as acting "bizarre" at the time of his arrest. The intake form characterized Gonzalez as "combative." The authorities placed him in the sobering cell with Castro.

The West Hollywood station manual defines a "sobering cell" as a "cell with a padded floor and standard toilet with a padded partition on one side for support. It must allow for maximum visual supervision of prisoners by staff." The sobering cells are to be used to house inmates who are a threat to their own safety or to others' safety. The station manual provides that non-compliant sobering cells "should *not* be utilized."

California's Building Code, adopted through legislative action by the Los Angeles County Board of Supervisors as County law, also includes standards that govern sobering cells. L.A. Cty. Code tit. 26, ch. 1, § 100 (2007). In 2009, the building code required maximum visual supervision of all inmates by staff and provided that inmates requiring more than minimum security must be housed in cells with an inmate or sound-activated audio-monitoring system. Cal. Bldg. Code tit. 24, §§ 1231.2.4, 1231.2.22 (2007). The sobering cell at the West Hollywood police station met neither of those requirements, yet it was used routinely.

Shortly after Gonzalez entered the cell, Castro approached the door and pounded on the window in the door, attempting

to attract an officer's attention. No one responded. Christopher Solomon, the station's supervising officer, had assigned an unpaid community volunteer to monitor the cell. The volunteer walked by the cell about 20 minutes after Castro had sought help. He noticed that Castro appeared to be asleep and that Gonzalez was "inappropriately" touching Castro's thigh, in violation of jail policy. The volunteer did not enter the cell to investigate. Instead, he reported the contact to Solomon. Six minutes later, Solomon arrived at the sobering cell and saw Gonzalez making a violent stomping motion. He opened the door, discovered Gonzalez stomping on Castro's head, and found Castro lying unconscious in a pool of blood. Solomon separated Gonzalez from Castro and called for medical assistance.

When the paramedics arrived, Castro was unconscious, in respiratory distress, and blue. He was hospitalized for almost a month, after which he was transferred to a long-term care facility, where he remained for four years. He suffers from severe memory loss and other cognitive difficulties.

Castro filed a complaint against the County of Los Angeles and the LASD (the "entity defendants"), as well as Solomon and Solomon's supervisor, David Valentine (the "individual defendants"). He sought to recover actual damages, future damages, punitive damages, and compensation for pain and suffering. Castro claimed that both the entity defendants and the individual defendants violated his constitutional rights by housing him in the sobering cell with Gonzalez and by failing to maintain appropriate supervision of the cell.

The case proceeded to trial. After Castro presented his case, Defendants moved for judgment as a matter of law on

three grounds: (1) insufficient evidence that the design of a jail cell constitutes a policy, practice, or custom by the County that resulted in a constitutional violation; (2) insufficient evidence that a reasonable officer would have known that housing Castro and Gonzalez together was a violation of Castro's constitutional rights; and (3) insufficient evidence for the jury to award punitive damages. The district court denied the motion. The jury returned a verdict for Castro on all counts and awarded him more than $2 million in damages. Defendants then filed a renewed motion for judgment as a matter of law. The district court denied the renewed motion without issuing a written opinion. Defendants timely appeal.

A three-judge panel affirmed the judgment of the district court as to the individual defendants but reversed as to the entity defendants. *Castro v. County of Los Angeles*, 797 F.3d 654 (9th Cir. 2015). A majority of active non-recused judges voted to rehear the case en banc. 809 F.3d 536 (9th Cir. 2015).

STANDARD OF REVIEW

We review de novo the district court's denial of a motion for judgment as a matter of law. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004). A renewed motion for judgment as a matter of law is properly granted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a

contrary conclusion." *Id.* In assessing the jury's verdict, we may not weigh the evidence but simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227–28 (9th Cir. 2001).

## DISCUSSION

We address first the claims against the individual defendants and then the claims against the entity defendants.[2]

### A. *Individual Defendants*

The jury found Solomon and Valentine liable for injuries to Castro. Solomon and Valentine maintain that, as a matter of law, they are entitled to qualified immunity and that Castro has failed to show that they were deliberately indifferent to a substantial risk of serious harm.

### 1. *Qualified Immunity*

Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether

---

[2] We incorporate by reference the three-judge panel's opinion as to punitive damages, contained in section II.C., *Castro*, 797 F.3d at 669–70, and as to future medical expenses, contained in section II.E., *id.* at 675–76. And we reject the County's claim that the Eleventh Amendment bars this suit. *See Jackson v. Barnes*, 749 F.3d 755, 764–65 (9th Cir. 2014) (holding that a sheriff's department is a county actor when supervising a jail); *Streit v. County of Los Angeles*, 236 F.3d 552, 566–67 (9th Cir. 2001) (same).

an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Here, Castro—a pretrial detainee who had not been convicted of any crime—had a due process right to be free from violence from other inmates. Fifteen years before Castro's arrest, in *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), the Supreme Court made clear that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners" because corrections officers have "stripped [the inmates] of virtually every means of self-protection and foreclosed their access to outside aid." (Internal quotation marks and ellipsis omitted.) And the Court had consistently held (before Castro's arrest) that the due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

The individual defendants acknowledge that the duty to protect Castro from violence was clearly established at the time of the incident. But they argue that such a broad description of that duty is too general to guide our analysis. They also contend that Castro failed to present substantial evidence to establish that they violated their duty to protect him. We disagree with both of those arguments.

First, a right is clearly established when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003)

(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "contours" of Castro's right were his right to be free from violence at the hands of other inmates. *Farmer*, 511 U.S. at 833. The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated Castro's right. Nor do the official's actions, in this context, require some affirmative act. As we held months before Castro's arrest, "direct causation by affirmative action is not necessary: 'a prison official may be held liable under the Eighth Amendment if he knows that inmates face a substantial risk of serious harm and disregards that risk *by failing to take reasonable measures to abate it*.'" *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (ellipsis omitted) (quoting *Farmer*, 511 U.S. at 847). The contours of the right required only that the individual defendants take reasonable measures to mitigate the substantial risk to Castro. Accordingly, we reject the individual defendants' argument that the law on which Castro bases his claim was not clearly established at the time of the incident. Therefore, qualified immunity does not bar the claim against them.

Second, as a factual matter, the jury found that both Solomon and Valentine understood that placing Castro in a cell with a combative inmate, when the cell had no audio or video surveillance and only occasional monitoring, could lead to serious violence against Castro. Substantial evidence supports those findings.

2. *Deliberate Indifference*[3]

Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding that, under the Due Process Clause, a detainee may not be punished prior to conviction). Under both clauses, the plaintiff must show that the prison officials acted with "deliberate indifference."

The standard under the Eighth Amendment to prove deliberate indifference for individual defendants is well established. A prison official cannot be found liable under the Cruel and Unusual Punishment Clause for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "In other words, the official must demonstrate a *subjective awareness* of the risk of harm." *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010), *cert. granted and judgment vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

The standard to find an individual deliberately indifferent under the Fourteenth Amendment, however, is less clear. Our court's most recent pronouncement on the issue is in

---

[3] Judge Watford joins the majority opinion with the exception of section A.2 of the Discussion.

*Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010). In *Clouthier*, parents of a pretrial detainee sued a mental health specialist, sheriff's deputies, and the County of Contra Costa, claiming that the defendants had violated the due process rights of their son by failing to prevent his suicide. *Id.* at 1236. We read *Farmer* and *Bell* to create a single "deliberate indifference" test for plaintiffs who bring a constitutional claim—whether under the Eighth Amendment or the Fourteenth Amendment. We interpreted *Bell* to require proof of punitive intent for failure-to-protect claims, whether those claims arise in a pretrial or a post-conviction context. *Id.* We held that,

> [i]n light of the Supreme Court's rulings that conditions of confinement violate pretrial detainees' Fourteenth Amendment rights if the conditions amount to punishment and that failure to prevent harm amounts to punishment where detention officials are deliberately indifferent, . . . the "deliberate indifference" standard applies to claims that correction facility officials failed to address the medical needs of pretrial detainees.

*Id.* at 1242 (citations omitted). We further held that this standard incorporates the *subjective* test articulated in *Farmer*. *Id.* Under that test, we held that "[a]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment," and so could not support liability under either the Eighth or the Fourteenth Amendment. *Id.* (quoting *Farmer*, 511 U.S. at 838).

The Supreme Court, however, cast that holding into serious doubt in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). There, the Court considered whether, to prove an excessive force claim, a pretrial detainee must show that the officers were subjectively aware that their use of force was unreasonable, or only that the officers' use of force was objectively unreasonable. *Id.* at 2470. To analyze that question with respect to the officers' use of force, which had included a five-second Taser stun blast to the pretrial detainee's back, the Supreme Court explained:

> In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive."

*Id.* at 2472. The Court emphasized that there was "no dispute" as to the first of those questions, because everyone agreed that the officers' use of force was intentional. *Id.* It was the second question, on which there was a dispute, that the Court answered. On that second issue, the Court concluded that "the relevant standard is objective not subjective." *Id.* Putting it in other words, the Court explained:

> In deciding whether the force deliberately used [by the officer on the pretrial detainee] is, constitutionally speaking, "excessive," should courts use an objective standard only,

> or instead a subjective standard that takes into account a defendant's state of mind? It is with respect to *this* question that we hold that courts must use an objective standard. In short, . . . a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.

*Id.* at 2472–73.

Under *Kingsley*, then, it does not matter whether the defendant understood that the force used was excessive, or intended it to be excessive, because the standard is purely objective. *Id.* In so holding, the *Kingsley* Court expressly rejected the interpretation of *Bell* on which we had relied in *Clouthier*. The Court concluded that, "as *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only *objective* evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74 (emphasis added). In sum, *Kingsley* rejected the notion that there exists a single "deliberate indifference" standard applicable to *all* § 1983 claims, whether brought by pretrial detainees or by convicted prisoners.

*Kingsley* did not squarely address whether the objective standard applies to all kinds of claims by pretrial detainees, including both excessive force claims and failure-to-protect claims. An excessive force claim, like the one at issue in *Kingsley*, differs in some ways from a failure-to-protect claim, like the one at issue here. An excessive force claim requires an affirmative act; a failure-to-protect claim does not require an affirmative act. And *Kingsley*'s holding concerned

whether the "force deliberately used is, constitutionally speaking, 'excessive,'" *id.* at 2472, which does not necessarily answer the broader question whether the objective standard applies to all § 1983 claims brought under the Fourteenth Amendment against individual defendants.

On the other hand, there are significant reasons to hold that the objective standard applies to failure-to-protect claims as well. "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 330 (1986)); *see also Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016) (noting that the underlying right in a § 1983 suit tracks the text of the Constitution). The underlying federal right, as well as the nature of the harm suffered, is the same for pretrial detainees' excessive force and failure-to-protect claims. Both categories of claims arise under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause. "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley*, 135 S. Ct. at 2475.

We note, too, the broad wording of *Kingsley*. In rejecting the interpretation of *Bell* on which we relied in *Clouthier*, the Court wrote that "a pretrial detainee can prevail by providing only objective evidence that *the challenged governmental action* is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 135 S. Ct. at 2473–74 (emphasis added). The Court

did not limit its holding to "force" but spoke to "the challenged governmental action" generally. We therefore overrule *Clouthier* to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a pretrial detainee's failure-to-protect claim.

On balance, we are persuaded that *Kingsley* applies, as well, to failure-to-protect claims brought by pretrial detainees against individual defendants under the Fourteenth Amendment. Excessive force applied directly by an individual jailer and force applied by a fellow inmate can cause the same injuries, both physical and constitutional. Jailers have a duty to protect pretrial detainees from violence at the hands of other inmates, just as they have a duty to use only appropriate force themselves.

Because of the differences between failure-to-protect claims and claims of excessive force, though, applying *Kingsley*'s holding to failure-to-protect claims requires further analysis. As explained above, *Kingsley* recognized that there are two state-of-mind issues at play in an excessive force claim.

The first—the officer's state of mind with respect to his physical acts—was undisputedly an intentional one there, because the officer had taken the affirmative act of using force knowingly and purposefully. In the failure-to-protect context, in which the issue is usually inaction rather than action, the equivalent is that the officer's conduct with respect to the plaintiff was intentional. For example, if the claim relates to housing two individuals together, the inquiry at this step would be whether the placement decision was

intentional.  Or, if the claim relates to inadequate monitoring of the cell, the inquiry would be whether the officer chose the monitoring practices rather than, for example, having just suffered an accident or sudden illness that rendered him unconscious and thus unable to monitor the cell.  As the Supreme Court in *Kingsley* explained, "if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim," because the first state-of-mind factor would not be satisfied.  *Id.* at 2472. Similarly, that factor would not be satisfied in the failure-to-protect context if the officer's inaction resulted from something totally unintentional.

Under *Kingsley*, the second question in the failure-to-protect context would then be purely objective:  Was there a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered?  That inquiry differs from the inquiry with respect to an Eighth Amendment failure-to-protect claim: There, "the deprivation alleged must *objectively* be sufficiently serious; and the prison official must *subjectively* have a sufficiently culpable state of mind."  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).  As we have explained in the Eighth Amendment context, "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 1050 (quoting *Farmer*, 511 U.S. at 837).  Under *Kingsley*, a pretrial detainee need not prove

those subjective elements about the officer's actual awareness of the level of risk. At the same time, however, the Supreme Court has instructed that "mere lack of due care by a state official" does not "'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." *Daniels*, 474 U.S. at 330–31 (holding that negligent actions or omissions by state officials are not actionable under § 1983); *accord Davidson v. Cannon*, 474 U.S. 344 (1986) (same). Thus, the test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard.

Putting these principles together, the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:

(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.**[4]**

With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily "turn[] on the 'facts and circumstances of each particular case.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham v. Connor*, 490 U. S. 386, 396 (1989)); *see also* Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016) (recognizing that "reckless disregard" may be shown by an objective standard under which an individual "is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it").

Although the jury instructions in this case differed from the template that we establish today, the jury made findings that would satisfy this test—or, to the extent that the jury did not, Defendants have waived any challenge to those aspects of the instructions. The district court instructed the jury that

---

**[4]** Judge Ikuta, in dissent, suggests that this new test would be "underinclusive." She claims that it could relieve some officials of liability despite their deliberate indifference because a jury might not find intent where a defendant failed to act. Ikuta, J., dissenting at 52. But the state-of-mind requirement articulated here is less stringent than the subjective test that preceded it. In a failure-to-protect case where a defendant actually knew of a substantial risk of serious harm and consciously took no action, one would expect a jury to find that the defendant made an intentional decision. Contrary to Judge Ikuta's view, the result in *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003), would be the same under our test. *Lolli* held only that summary judgment for some of the defendants was improper because factual issues remained for the jury. *Id.* at 419–21. And the four required factors prevent "overinclusiveness" by ensuring that liability will attach only in cases where the defendant's conduct is more egregious than mere negligence.

Castro's claim involved Defendants' deprivation of Castro's "constitutional right to have reasonable measures taken to guarantee his safety when he was incarcerated at the West Hollywood jail," that Castro had to prove by a preponderance of the evidence that "the plaintiff faced a substantial risk of serious harm," that "the defendant was deliberately indifferent to that risk," and that "the acts, or failure to act, of the defendant caused harm to the plaintiff." The instructions further recognized that "deliberate indifference" required the defendant to "fail[] to take reasonable measures to address [the risk]." By finding in Castro's favor, the jury necessarily found that Castro had satisfied his burden of proof on all of those points. To the extent that the instructions did not explain that reasonable measures must be available or that the circumstances must have been such that a reasonable officer would have appreciated the risk, the individual defendants have not challenged any of the objective components of the instructions provided to the jury, nor have they argued that any issue should be retried if the subjective element of the test were eliminated in light of *Kingsley*.[5]

Here, the individual defendants do not claim that there was any miscommunication about the placement of Gonzalez in Castro's cell or that some other unintentional act created the jail conditions at issue. Nor do the individual defendants dispute that Castro faced a substantial risk of serious harm at the hands of Gonzalez or that they failed to take reasonable measures to mitigate that risk. Rather, the individual defendants argue that there was insufficient evidence to establish their subjective awareness of the danger that Castro

---

[5] In response to orders from this court, the parties filed two rounds of supplemental briefing specifically addressing the question of how *Kingsley* affects this case.

faced and their knowing disregard of it, or to establish that their conduct caused Castro's injuries.

In light of the analysis above, to affirm the jury's verdict we need only determine that there was substantial evidence that a reasonable officer in the circumstances would have appreciated the high degree of risk involved and that the officers' failure to take reasonable measures to protect Castro caused his injuries. The jury here found that the officers knew of the substantial risk of serious harm to Castro, which necessarily implies that the jury found that a reasonable officer would have appreciated the risk. Indeed, the jury found that the risk was so obvious, and the individual defendants' lack of response to it was so blameworthy, that it awarded punitive damages after being instructed as follows:

> You may award punitive damages only if you find that the defendant's conduct that harmed the plaintiff was malicious, oppressive, or in reckless disregard of the plaintiff's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff. Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that his actions will violate the plaintiff's rights under federal law. An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, such as by the misuse or abuse of authority or power or by the taking

advantage of some weakness or disability or misfortune of the plaintiff.

There clearly is sufficient evidence to support those findings, as well as the jury's finding that the officers caused Castro's injuries by failing to take reasonable measures to address the risk. The individual defendants knew that Castro, who had been detained only for a misdemeanor, was too intoxicated to care for himself; they knew that Gonzalez, a felony arrestee, was enraged and combative; they knew or should have known that the jail's policies forbade placing the two together in the same cell in those circumstances; and they knew or should have known that other options for placing them in separate cells existed. Moreover, Valentine decided to house Castro in a fully walled sobering cell with a "combative" inmate even though separate cells were typically available and unused. Solomon failed to respond to Castro's banging on the window in the door of the cell. Jail video of the hallway showed Castro pounding on his cell door for a full minute, while Solomon remained unresponsive, seated at a desk nearby. Solomon failed to respond fast enough to Gonzalez' inappropriate touching of Castro. Solomon also erred in delegating the safety checks to a volunteer. Valentine failed to supervise Solomon in a way that would have prevented harm to Castro. We have no difficulty concluding that this evidence is sufficient to sustain the jury's verdict in Castro's favor.

B. *Entity Defendants*

Castro has also sued the County of Los Angeles and the LASD under 42 U.S.C. § 1983. In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality may not be held liable for a § 1983

violation under a theory of respondeat superior for the actions of its subordinates. In order to establish municipal liability, a plaintiff must show that a "policy or custom" led to the plaintiff's injury. *Id.* at 694. The Court has further required that the plaintiff demonstrate that the policy or custom of a municipality "reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

In this case, the district court instructed the jury as follows with respect to the entity defendants:[6]

> In order to prevail on his claim against [the entity defendants], plaintiff must prove each of the following elements by a preponderance of the evidence:
>
> 1.    the plaintiff was deprived of a constitutional right;
>
> 2.    the [entity defendants] had a longstanding practice or custom of detaining highly intoxicated people in the West Hollywood jail detoxification cell without constitutionally adequate visual surveillance and audio monitoring;

---

[6] The court did not define "deliberately indifferent" in the instruction concerning the entity defendants, but the entity defendants do not assign error to that omission. In an earlier instruction concerning the individual defendants, the court defined "deliberately indifferent" to mean that "the defendant knew of the risk and disregarded it by failing to take reasonable measures to address it. Merely being negligent, or failing to alleviate a significant risk that the defendant should have perceived but didn't, does not constitute 'deliberate indifference.'"

3. the [entity defendants'] longstanding practice or custom regarding the level of visual surveillance and audio monitoring of the West Hollywood jail detoxification cell was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to prisoners in the West Hollywood jail detoxification cell;

4. the [entity defendants'] longstanding practice or custom caused harm to plaintiff.

Plaintiff must establish an affirmative link between the practice or custom and the particular constitutional violation at issue.

"Practice or custom" means any permanent, widespread, well-settled practice or custom that constitutes a standard operating procedure of the defendant County of Los Angeles.

The court also described the alleged constitutional violation specifically, explaining that Castro's claim was that the entity defendants "deprived him of his constitutional right to have reasonable measures taken to guarantee his safety when he was incarcerated at the West Hollywood jail." Finally, the court cautioned:

In evaluating the facts in this case, you must consider the context in which the jails operate. In determining whether defendants violated plaintiff's rights as alleged, you should give deference to jail officials in the

adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security. In other words, you must consider whether, in allegedly exposing plaintiff to danger, the defendants were guided by equally important considerations. The existence of arguably superior alternatives to the design, operation, and conditions in place in a jail does not necessarily give rise to constitutional liability.

The entity defendants contest the verdict against them on several grounds: that the instructions were erroneous because they spelled out what custom or practice Castro alleged; that the design of a jail cell is not a policy, custom, or practice; and that the evidence failed to show either causation or deliberate indifference.[7] We are not persuaded. Grouping those challenges somewhat differently, we will address, first, whether the instructions were adequate; second, whether the entity defendants had a policy or custom that caused Castro's

---

[7] The entity defendants also argue that a plaintiff can establish neither a custom or practice, nor deliberate indifference, without proving prior incidents of harm. The entity defendants failed to preserve that argument in the district court. *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) (holding that an appeals court will generally not consider an argument raised for the first time on appeal). Indeed, they argued the very opposite. At trial, Defendants vigorously opposed the introduction of Castro's anticipated "evidence of prior or subsequent assaults on other inmates," on the ground that "such evidence is irrelevant and unduly prejudicial." Even if not waived or forfeited, the argument is legally inaccurate. *See Brown*, 520 U.S. at 409 (noting that evidence of a single violation of federal rights can, in some circumstances, trigger municipal liability).

injury; and, third, whether the policy or custom reflected deliberate indifference on the part of the municipality.

### 1. *Jury Instructions*

We review the formulation of jury instructions for abuse of discretion in a civil case, considering the instructions as a whole. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). Under that standard, we see no error. The instructions properly identified the elements of Castro's claim against the entity defendants. The district court's decision to focus the jury's attention on the particular custom or practice alleged was neither misleading nor inadequate. *See id.* (stating that the appellate court determines whether the instructions, considered as a whole, are misleading or inadequate). To the contrary, the instruction clarified precisely what the jury was called on to decide.

### 2. *Policy or Custom Causing Injury*

The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. The custom or policy must be a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion).

As noted, the entity defendants argue that the architecture of the West Hollywood police station's sobering cell cannot be a policy, custom, or practice. We need not decide that

question, because the design of the cell is not the custom or practice alleged by the plaintiff and found by the jury. Whether or not the design of the cell is a policy, custom, or practice, it is a fact; the sobering cell lacked audio monitoring and video surveillance.[8]

That is, the design of the cell is only the backdrop for the entity defendants' policy or custom, as described in the jury instructions and as reflected in the record. The LASD and the County made deliberate choices *in light of* the poor design and location of the sobering cell. There was a custom of housing intoxicated inmates in sobering cells that contained inadequate audio monitoring. A representative of the County admitted that other options existed; there were other cells in which to detain intoxicated prisoners. The entities chose a policy to check on inmates only every 30 minutes. A representative of the County testified that supervision of the sobering cell consisted of "half-hour checks by the jailer." These routine practices were consciously designed and, together, they amount to a custom or policy.[9] The custom or

---

[8] We note, though, that every construction project requires deliberate choices in design and implementation. The West Hollywood station is no exception. For example, the County admitted that it chose not to install a video camera that records what happens inside the cell, because it wanted to protect the privacy of detainees.

[9] Judge Callahan's dissent takes issue with formulating a "custom or practice" that has more than one component. Callahan, J., dissenting at 41–43. The entity defendants have not made that argument and, therefore, have forfeited or waived it. *See Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) (holding that generally we will not consider issues not presented in an appellant's opening brief). Moreover, a "custom or practice" need not be narrowly unitary in this context. We have found no case holding that a "policy" must be one-dimensional. To the contrary, many cases describe multi-faceted policies, which are not

policy, in summary, was to use a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only once every half hour.

The entity defendants' custom or policy caused Castro's injury. Had the entity defendants provided consistent monitoring, or had the entity defendants required Castro and his attacker to be housed in different locations, which were available,[10] Gonzalez' attack on Castro could have been averted. The stated purpose of the sobering cell is the housing of prisoners who are a threat to their own safety. But the absence of frequent visual checks and the lack of audio

rejected for that reason. *See, e.g.*, *Garcia v. County of Riverside*, 817 F.3d 635, 638, 642 (9th Cir. 2016) (describing the relevant policy of the Los Angeles Sheriff's Department as having several components).

[10] Judge Callahan's dissent also appears to argue that there cannot be a deliberately chosen custom or practice of housing a belligerent detainee in the same sobering cell as another detainee because a written policy prohibited it. Callahan, J., dissenting at 43 n.5. But a plaintiff can show a custom or practice of violating a written policy; otherwise an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (holding that "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded" and "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law" (internal quotation marks omitted)). Here, for example, there was testimony that "two or more belligerent drunk individuals" were housed in "this detox cell" "[m]any times." Taking the facts in the light most favorable to the prevailing party, as our standard of review requires, we conclude that the jury permissibly found that such testimony established a policy of deliberate indifference.

monitoring clearly made the risk of serious harm to such prisoners substantial. The jury found that LASD's and the County's custom or practice caused Castro's injury. Substantial evidence supports the jury's findings.

### 3. *Deliberate Indifference*

It is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury. A plaintiff must also demonstrate that the custom or policy was adhered to with "deliberate indifference to the constitutional rights of [the jail's] inhabitants." *City of Canton*, 489 U.S. at 392.

The Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry. In *City of Canton*, which concerned a Fourteenth Amendment claim for failure to train, the Court held that a municipality was deliberately indifferent when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. The Court articulated a standard permitting liability on a showing of notice: "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual *or constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *Id.* at 396 (emphasis added).

In *Farmer*, the Court clarified its earlier holding: "[I]t would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on

obviousness or constructive notice, as anything but objective." *Farmer*, 511 U.S. at 841. The Court understood that this objective standard necessarily applied to municipalities for the practical reason that government entities, unlike individuals, do not themselves have states of mind: "Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." *Id.* We, too, have recognized that an objective standard applies. *Gibson v. County of Washoe*, 290 F.3d 1175, 1195 (9th Cir. 2002). To the extent that *Gibson* or our other cases suggest otherwise, we now overrule those holdings.

Here, substantial evidence supported the jury's finding that the County knew that its cell design might lead to a constitutional violation among its inhabitants. At the time of the attack in this case, the Los Angeles County Code "adopted by reference and incorporated into . . . the Los Angeles County Code as if fully set forth below" chapters of the California Building Code.[11] L.A. Cty. Code tit. 26, ch. 1, § 100 (2007). In turn, the California Building Code requires "an inmate- or sound-actuated audio monitoring system in . . . sobering cells . . . which is capable of alerting personnel who can respond immediately." Cal. Bldg. Code tit. 24 § 1231.2.22 (2007). Furthermore, the West Hollywood police station's *own manual* mandates that a sobering cell "allow for

---

[11] Even though the County Code provision was not in evidence in the district court, we may take judicial notice of it because it is "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (holding that local ordinances are proper subjects for judicial notice).

maximum visual supervision of prisoners by staff." The station manual forbids the use of non-compliant sobering cells.

Judge Callahan's dissent makes much of the fact that the California Building Code contains a "grandfather" clause. Callahan, J., dissenting at 38. But the dissent overlooks that the *West Hollywood manual* contains no such "grandfather" clause. To the contrary, that manual expressly refers to current building standards and expressly declines to permit the use of older cells simply by virtue of their having been previously compliant:

> A sobering cell is generally defined as a cell with a padded floor and standard toilet with a padded partition on one side for support. It must allow for maximum visual supervision of prisoners by staff. For specific construction specifications refer to Uniform Building Code, Title 24, Section 13-102(c)2 and 13-102(c)3.
>
> Most station sobering cells (built prior to current State standards) have a hard floor, standard toilet, wash basin, drinking fountain, and a solid raised ledge or bench. Unless otherwise exempted by the State Board of Corrections, these sobering cells are out of compliance with current standards and should *not* be utilized.

The West Hollywood sobering cell was non-compliant in at least two respects, in that it lacked all the required padding

and, more importantly for our purposes, did not "allow for maximum visual supervision of prisoners by staff."

The County Board of Supervisors' affirmative adoption of regulations aimed at mitigating the risk of serious injury to individuals housed in sobering cells, and a statement to the same effect in the station's manual, conclusively prove that the County knew of the risk of the very type of harm that befell Castro. *See Brown*, 520 U.S. at 405–06 (describing *Owen v. City of Independence*, 445 U.S. 662 (1980), and *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), as municipal liability cases involving "no difficult questions of fault" because they involved "formal decisions of municipal legislative bodies"). The adoption of a regulation by the County's legislative body suffices as proof of notice because the County necessarily has knowledge of its own ordinances. We have said that "a municipality's policies [that] explicitly acknowledge that substantial risks of serious harm exist" may demonstrate municipal knowledge of that risk for the purposes of a Fourteenth Amendment failure-to-protect claim. *Gibson*, 290 F.3d at 1188 n.10. Here, the ordinance adopted by the County is a policy that explicitly acknowledges the relevant substantial risks of serious harm.

Accordingly, the entity defendants had notice that their customs or policies posed a substantial risk of serious harm to persons detained in the West Hollywood sobering cell and were deliberately indifferent to that risk. Therefore, we affirm the judgment against the entity defendants.

**AFFIRMED.**

CALLAHAN, Circuit Judge, with whom BEA and IKUTA, Circuit Judges join, dissenting in part:

I agree that the judgment against the individual defendants should be affirmed,[1] but I dissent from the affirmance of the judgment against the entity defendants. I agree with the majority's conceptual approach: we must first determine whether the entity defendants had a policy or custom that caused Castro's injury, and second determine whether the policy or custom reflected deliberate indifference. Maj. Op. at 26–27. However, the majority understates what is necessary to show a policy related to Castro and uses "smoke and mirrors" to find deliberate indifference. Regardless of what evidence Castro might have, could have, or should have produced at trial, the record in this case—even construed in the light most favorable to Castro—permits only one conclusion: the County of Los Angeles did not have a policy or custom that reflected deliberate indifference and caused Castro's injury.

## I. The Legal Standard for *Monell* Liability

The Supreme Court has been fairly consistent in explaining the basis for *Monell* liability. In *Pembaur v. City of Cincinnati*, the Court held "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for

---

[1] As the majority opinion makes clear, the judgment against the individuals is sound even under the standard set forth in *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010). Thus, while I agree with the majority that the judgment against the individual defendants should be affirmed, I do not join in its reasoning.

establishing final policy with respect to the subject matter in question." 475 U.S. 469, 483 (1986).

In *City of Canton*, *Ohio v. Harris*, the Court addressed "whether a municipality's failure to train employees can ever be a basis for § 1983 liability." 489 U.S. 378, 388 (1989). It held "that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and the policy was "the moving force [behind] the constitutional violation." *Id.* (internal quotation marks omitted). The Court emphasized that "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390.

In *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404–05 (1997), the Court explained:

> As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct

          causal link between the municipal action and
          the deprivation of federal rights.

More recently, in *Connick v. Thompson*, the Supreme Court reiterated that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." 563 U.S. 51, 61 (2011) (quoting *Brown*, 520 U.S. at 410). The Court explained, "[a] less stringent standard of fault for a failure-to-train claim 'would result in de facto respondeat superior liability on municipalities.'" *Id*. (quoting *City of Canton*, 489 U.S. at 392).

Accordingly, even accepting that an "objective" standard applies to the inquiry into the propriety of a municipality's actions, *Monell* liability requires first, a showing of "a deliberate choice to follow a course of action . . . from among various alternatives." *Pembaur*, 475 U.S. at 483. Second, where *Monell* liability is based on the municipality's failure to act or to train its employees, there must be a showing of deliberate indifference: "proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. Third, there must be a "a direct causal link between the municipal action and the deprivation of federal rights." *Id*. at 404.

## II. The record does not support a finding of a deliberate choice sufficient to support *Monell* liability

1. *Castro presented insufficient evidence to support a finding that the West Hollywood station's sobering cell was unsafe.*

The majority asserts that when Castro was assaulted in 2009, the applicable building codes required maximum visual supervision and that sobering cells contain an audio-monitoring system. Maj. Op. at 6. But the record in this case does not support this conclusion.

No evidence was introduced at trial that federal or state law required video monitoring of a sobering cell. No County Code provisions or relevant California statutes were introduced at trial. Moreover, it appears that the California Building Code, tit. 24, § 1231.2.22 (2007), which the majority cites, did not say anything about sobering cells. Coverage of sobering cells was added to that section when the code was updated in 2010, after Castro had been assaulted. Cal. Building Code tit. 24 § 1231.2.22 (2010).

Instead, the majority relies on the County Board of Supervisors' adoption "through legislative action" of provisions of the California Building Code that the majority characterizes as "aimed at mitigating the risk of serious injury to individuals housed in sobering cells." *See* Maj. Op. at 6, 33. But the County Code provision adopting the provisions of the California Building Code was not placed in evidence in the district court. As this material was not before the jury, the jury could not have relied upon it to find a policy or custom.

Furthermore, the majority's characterization of the "legislative action" is hardly fair. In 2007, the County adopted by reference and incorporated into its code several chapters of the California Building Code. Within the over 1,300 pages adopted are provisions calling for maximum visual supervision and audio-monitoring of sobering cells. Cal. Bldg. Code tit. 24 §§ 1231.2.4, 1231.2.22. But this did not give rise to the constructive knowledge alleged by the majority because the California Building Code has a "grandfather" clause. It provides that "[t]hese requirements shall not be applicable to facilities which were constructed in conformance with the standards of the Corrections Standard Authority in effect at the time of initial architectural planning." Cal. Code Regs. Title 24, § 13-102(6) (2008). Indeed, we previously recognized the import of this clause in *Blackwell v. City & County of San Francisco*, 506 F. App'x 585, 587 (9th Cir. 2013) (unpublished) (citing the statement in *Californians for Disability Rights v. Mervyn's LLC*, 165 Cal. App. 4th 571 (2008), that Title 24 "does not require facilities that predate its enactment to comply with its regulations unless and until the facility is altered"). In addition, the existence of the grandfather clause indicates that the new audio and visual monitoring standards in the California Building Code were not essential for the safety of detainees. Thus, the County's adoption of 1,300 pages of the California Building Code in 2007, could not have alerted the County to the alleged risk of being housed in the West Hollywood station's sobering cell.

At the end of its opinion, the majority attempts to downplay the importance of the grandfather clause by arguing that a provision in the West Hollywood manual does not contain a grandfather clause. Maj. Op. at 32. This is true, but the document is not sufficient to support *Monell* liability.

While the cited first paragraph of the West Hollywood station's manual generally defines a sobering cell and requires "maximum visual supervision of prisoners by staff," the second paragraph states:

> Most station sobering cells (built prior to current State standards) have a hard floor, standard toilet, wash basin, drinking fountain, and a solid raised ledge or bench. Unless, otherwise exempted by the State Board of Corrections, these sobering cells are out of compliance with current standards and should not be utilized.

Notably, the inadequacy of visual inspection is not listed as an example of non-compliance excluding the use of a sobering cell. Moreover, this provision presumably precluded the use of the West Hollywood sobering cell by anyone at any time. It does not appear that the general propriety of using the West Hollywood station's sobering cell was raised or considered in the trial court.[2]

Furthermore, Castro offered no evidence as to whether the sobering cell met that applicable standards when it was built or those in effect in 2007. He was offered an opportunity to present evidence of prior incidents at the West Hollywood station, but declined to do so. Indeed, it appears that Castro's choice to focus on the officers' deliberate indifference was

---

[2] The majority asserts that the sobering cell was non-compliant both because it "lacked all the required padding" and did not "allow for maximum visual supervision of prisoners by staff." Maj. Op. at 32–33. This seems to detract from its argument that there was a "deliberate choice" not to monitor Castro.

both strategic and successful. An argument that the structure of the West Hollywood police station was even partially responsible for Castro's injuries might have, in the eyes of the jury, reduced the level of the individual officers' culpability.

The record in this case does not support an inference that any provision in the station manual or the adoption of various chapters of the California Building Code somehow established that the West Hollywood station's sobering cell presented a known or obvious danger.

   2.  *There is insufficient evidence to support a finding of a custom or policy.*

The majority proceeds to offer a hodgepodge of rationales in an attempt to discern a deliberate choice or policy. First, implicitly acknowledging the lack of evidence concerning the propriety of the design of the sobering cell, the majority disclaims that the design of the cell is a policy, custom, or practice, asserting that "the design of the cell is only the backdrop."[3] Maj. Op. at 28. Second, the majority asserts that "in light of the poor design and location of the sobering cell . . . there was a custom of housing intoxicated inmates in sobering cells that contained inadequate audio monitoring." Maj. Op. at 28. Third, it asserts that there were "other cells

---

[3] Nonetheless, in a footnote the majority suggests that the construction of the cell was a deliberate choice. Maj. at 28 n.8. In support of this assertion, the majority cites a deputy who stated that they did not put a video camera in the cell "because of privacy issues." However, the deputy also noted that there is a video camera outside the cell that is aimed through the cell door's window. In any event, the comments of a deputy whose assignment to the West Hollywood station began well after the station was constructed, do not support a finding of "deliberate choice in design and implementation."

in which to detain intoxicated prisoners." Maj. Op. at 28. Fourth, the majority criticizes the "half-hour checks by the jailer." Maj. Op. at 28. The majority then cobbles these assertions together and proclaims that they constitute a custom or policy "to use a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only once every half hour." Maj. Op. at 28–29.

This conclusion is illusory. First, it depends on a "policy" which does not exist. There is no policy "to place more than one belligerent drunk" in one cell. Rather, there was an explicit written policy forbidding the placement of more than one person in the detoxication cell. A deputy testified that when it became absolutely necessary to place a second person in the detoxication cell, they would take the less belligerent individual over to the Beverly Hills station and use its sobering cell. Indeed, the majority itself affirms that the individual defendants knew that Castro "was too intoxicated to care for himself; they knew that Gonzalez, a felony arrestee, was enraged and combative; they *knew or should have known that the jail's policies forbade placing the two in the same cell in those circumstances*; and they *knew or should have known that other options for placing them in separate cells existed*." Maj. Op. at 23 (emphasis added).

Second, the majority's "the whole is greater than the sum of its parts" argument is not persuasive. Neither the individual parts nor their accumulation amount to a deliberate choice among various alternatives. The statement that there "was a custom of housing intoxicated inmates in sobering cells that contained inadequate audio monitoring" simply restates the majority's factually unsupported conclusion that inadequate audio monitoring at the West Hollywood station

violated Castro's constitutional rights. That there were other cells available makes it clear that the officers should have followed the County's policy against placing a second person in the sobering cell. Also, the majority's denigration of the half-hour checks lacks any evidentiary basis. There is nothing in the record to suggest this policy was unreasonable or reflected deliberate indifference to the constitutional rights of detainees. Indeed, there was testimony that the half-hour checks were mandated by both state and department rules.

The record in this case includes no evidence that anyone in the County had considered, prior to this litigation, whether the new California Building Codes, with its grandfather clause, applied, or might have applied, to the West Hollywood police station. While there was evidence of the station's physical layout, there was no evidence that the spacing had caused any prior problems.[4] Rather than reflect deliberate indifference, the "choices" the majority manufactures from a sparse record appear to be independent factors that by chance coincided to Castro's detriment, primarily because the individual officers failed to house Castro separately as required by the County's policy.

Of course, a custom or policy may have more than one component and may be contrary to a written policy. *See* Maj. Op. at 28–29, nn. 9–10. However, here, Castro failed to

---

[4] The majority suggests that the County has failed to preserve the argument that there was no evidence of prior incidents of harm. Maj. Op. at 26 n.7. But our inquiry is whether there are any indicia of a policy of deliberate indifference. The County's alleged waiver does not create evidence that was never admitted (and may not exist).

present a factual basis that can support a finding of deliberate indifference.[5]

## III.    There is no evidence of deliberate indifference

The majority quotes from the Supreme Court's opinion in *City of Canton* to support the position that constructive notice may be sufficient to establish the deliberate indifference required for *Monell* liability.  Maj. Op. at 30 (quoting *City of Canton*, 489 U.S. at 396).  But, as noted, the Supreme Court further explained that "the inadequacy of police training may serve as the basis for § 1983 liability *only where the failure to train amounts to deliberate indifference* to the rights of persons with whom the police come in contact."  *Id*. at 388 (emphasis added).  In *Connick* the Supreme Court reiterated that deliberate indifference requires "proof that a municipal

---

[5] The assertion at the end of the majority's footnote 9 that two or more belligerent drunks were housed in the detox cells many times, reflects the dangers inherent in an appellate court reviewing the record to determine facts that were not developed at trial.  The officer who testified that two "belligerent" drunks might be placed in the same cell, defined belligerent as:

> Not following instructions, just pretty much not wanting to be in there and just not going with the program, but it doesn't mean they were not getting along with other people.  Just pretty much not helping us to give us information and just pretty much just manners kind of thing.  Not physical.  Not that they would show violence to people around them but mostly to the staff.  Just annoyance kind of thing.

Moreover, as previously noted, there was also testimony that "99.9 percent of the time" when they had more than one belligerent and combative persons they would "take the less combative or belligerent of the two over to the Beverly Hills station and use their sobering cell."

actor disregarded a known or obvious consequence of his action."  563 U.S. at 61 (quoting *Brown*, 520 U.S. at 410).  In *City of Canton*, the Court explained that "the need for more or different training [must be] *so obvious*, and the inadequacy *so likely to result in the violation of constitutional rights*, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  489 U.S. at 390 (emphasis added).  Justice Brennan, in his concurring opinion, noted that only where "a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens" are the dictates of *Monell* satisfied.  489 U.S. at 396 (Brennan, J., concurring).

Here, there was no "known or obvious consequence," there was nothing "so obvious" or "so likely to result in the violation of constitutional rights" as to support a determination of deliberate indifference, and there was no substantial certainty.  Castro was attacked by Gonzalez who, pursuant to the County's express policy, should not have been placed in the cell occupied by Castro.  There is nothing to suggest that the County should have anticipated violations of its policy.  Moreover, the majority observes that the jury found that the individual officers "knew or should have known that the jail's policies forbade placing the two together in the same cell in those circumstances."  Maj. Op. at 23.

Fairly viewed, the record is devoid of evidence that the County "disregarded a known or obvious consequence," *Connick*, 563 U.S. at 61, and there is neither the obviousness nor the likelihood of a violation of a constitutional right necessary to support a finding of deliberate indifference. *See City of Canton*, 489 U.S. at 390.

## IV.   There is no direct causal link between the County's conduct and Castro's injuries

The majority's need to cobble together different "choices" in order to construct a policy of deliberate indifference also reflects the fact that there is no direct causal link between the policy perceived by the majority and Castro's injury. Castro was injured by Gonzalez, a violent detainee who was placed in the sobering cell with Castro in direct contravention of the County's clear policy against such placement. Moreover, Castro's injuries resulted from, or were aggravated by, his jailer's reckless disregard. The majority itself notes:

> Solomon failed to respond to Castro's banging on the window in the door of the cell. Jail video of the hallway showed Castro pounding on his cell door for a full minute, while Solomon remained unresponsive, seated at a desk nearby. Solomon failed to respond fast enough to Gonzalez's inappropriate touching of Castro.

Maj. Op. at 23. Indeed, the jury determined that the individual defendants were liable for punitive damages because they had "act[ed] with malice, oppression, or reckless disregard for plaintiff's rights." We, in turn, have affirmed the punitive damages award. Maj. Op. at 9 n.2.

There is no direct link between any of the alleged "choices" identified by the majority and Castro's assault. The adoption of the Building Code provides no connection as the Code included a grandfather clause exempting buildings like the West Hollywood station from the new audio and visual monitoring standards. There was no evidence that the

conditions in the sobering cell endangered detainees, absent the unauthorized placement of a violent detainee into the cell. There was no evidence showing that the "choice" of visual checks every 30 minutes was insufficient to protect properly placed detainees.

In *Clouthier v. County of Contra Costa*, we noted the Supreme Court's warning that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." 591 F.3d at 1253–54 (quoting *Canton*, 489 U.S. at 392). We concluded that "[h]olding the County liable for the missteps of its employees in this case would therefore amount to 'de facto respondeat superior liability,' an avenue rejected in *Monell*." This conclusion is equally applicable to this case. *See Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir. 1988) (noting that "[t]he City's failure to build a suicide-proof jail cell, and its inadequate training of its police force, may well be acts of negligent omission, but they have not been shown to be the result of municipal policy: 'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing formal policy with respect to the subject matter in question.'") (quoting *Pembaur*, 475 U.S. at 483). On the record before us, holding the County liable is tantamount to de facto respondeat superior liability, which the Supreme Court has consistently disapproved. *See Connick*, 563 U.S. at 61; *Canton*, 489 U.S. at 392.

## V. Conclusion

Castro's tragic injuries were a preventable tragedy, and we affirm the jury's determination of the individual defendants' culpability. However, the evidence proffered by Castro at trial does not support a finding that the County had a policy or custom that reflected deliberate indifference that led to Castro's injuries. Castro presented insufficient evidence that audio monitoring was required for the West Hollywood station's sobering cell in 2009. The adoption of California Building Code standards for audio and visual monitoring did not give the County even constructive notice that monitoring at the West Hollywood police station might be substandard because the Code includes a grandfather clause stating that the new standards are not applicable to existing structures. Moreover, there was no evidence of any prior incidents. The other alleged "choices" manufactured by the majority—the availability of other cells and "a policy to check inmates only every 30 minutes"—do not support a determination of deliberate indifference. Moreover, the immediate cause of Castro's injuries was the individual officers' placement of Gonzalez in Castro's cell in direct violation of the County's policy. In sum, there is insufficient evidence to support a finding of deliberate indifference by the County and there is no direct causal link between the County's maintenance of the West Hollywood sobering cell and Castro's injuries. Accordingly, I would vacate the award against the entity defendants.

IKUTA, Circuit Judge, with whom, CALLAHAN and BEA, Circuit Judges, join, dissenting:

I join Judge Callahan's dissent in full, but I write separately to express my dismay that the majority has misinterpreted *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and made a mess of the Supreme Court's framework for determining when pretrial detainees have suffered punishment in violation of their Fourteenth Amendment due process rights.

I

A pretrial detainee has a constitutional right under the Fourteenth Amendment to be free from punishment without due process of law. *Bell v. Wolfish*, 441 U.S. 520, 534 (1979); *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). According to *Bell*, when a pretrial detainee alleges a violation of a constitutional right (and does not point to a violation of any "express guarantee of the Constitution"), the only question is whether the situation at issue amounts to punishment of the detainee. 441 U.S. at 534. This right to be free from punishment under the Due Process Clause is the only constitutional right at issue in this case; neither Castro nor the majority claims that any other constitutional right is at issue.

Under Supreme Court precedent, there are four ways for pretrial detainees to establish that they were unconstitutionally punished.

First, and most obviously, a pretrial detainee can show that a government official's action was taken with an

"expressed intent to punish." *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at 538).

Second, a pretrial detainee can show that a government official's deliberate action was objectively unreasonable. *Id.* at 2472–73. An objectively unreasonable action is one that is not reasonably related to the government's legitimate interests, like interests in managing the detention facility and maintaining order. *Id.* at 2473. Because an objectively unreasonable action has no "legitimate nonpunitive governmental purpose," it indicates an intent to punish. *Id.* (quoting *Bell*, 441 U.S. at 561). A claim that an official used excessive force, rather than reasonable force necessary to maintain order, falls into this category. *Id*.

Third, a pretrial detainee can establish that a restriction or condition of confinement, such as a strip search requirement, is not reasonably related to a legitimate government purpose, which indicates that the purpose behind the condition is punishment. "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539.

Finally, a pretrial detainee can show that a governmental official's failure to act constituted punishment if the detainee can establish that the official was deliberately indifferent to a substantial risk of harm. The Supreme Court has made clear that a failure to act is not punishment at all unless the government official actually knew of a substantial risk and consciously disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). This standard follows from the "intent

requirement" implicit in the word "punishment," *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991); the unintentional or accidental infliction of harm amounts at most to negligence, which is not a due process violation, *Kingsley*, 135 S. Ct. at 2472. We have long applied this deliberate indifference standard to claims that a government official failed to address medical needs or otherwise protect pretrial detainees. *See Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010); *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1241–42 (9th Cir. 2010); *Lolli v. County of Orange*, 351 F.3d 410, 418–19 (9th Cir. 2003); *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1461 & n. 2 (9th Cir. 1988), *cert. granted, judgment vacated*, 490 U.S. 1087 (1989), *opinion reinstated*, 886 F.2d 235 (9th Cir. 1989).

Castro's claim falls into this last category. He alleges that a government official actually knew of a substantial risk of serious harm by putting Gonzalez in his cell and failed to protect him from that risk. As stated in Judge Callahan's dissent, we can affirm the judgment against the individual defendants on this ground.

## II

Rather than apply this well-established framework, the majority inexplicably holds that we must analyze a claim that a government official's failure to act constituted punishment under the standard applicable to excessive force claims, relying on the Supreme Court's recent decision in *Kingsley*.

A description of *Kingsley* shows it is entirely inapposite. In that case, when a detainee refused to remove a piece of paper covering his light fixture, four officers handcuffed him, forcibly removed him from the cell, and applied a Taser to his

back for about five seconds. 135 S. Ct. at 2470. The detainee brought an action under § 1983 claiming that the officers used excessive force against him in violation of the Fourteenth Amendment's Due Process Clause. *Id.* at 2470–71. The Court held that where officers deliberately use force against a pretrial detainee, the standard to determine whether the force is excessive is an objective one. *Id.* at 2472–73. The detainee need not prove that the officer intended to punish; it amounts to punishment if "the force purposefully or knowingly used against him was objectively unreasonable." *Id.* *Kingsley* is consistent with the Supreme Court cases establishing that where the government official's affirmative acts are shown to be "excessive in relation" to any "legitimate governmental objective," a court "permissibly may infer" that they are punitive in nature. *Bell*, 441 U.S. at 537–39.

But the *Kingsley* standard is not applicable to cases where a government official fails to act. As explained in *Bell*, in analyzing a pretrial detainee's Fourteenth Amendment claim, the key question is whether the situation at issue amounts to a punishment of the detainee. *Id.* While punitive intent may be inferred from affirmative acts that are excessive in relationship to a legitimate government objective, the mere failure to act does not raise the same inference. *See Farmer*, 511 U.S. at 837–38. Rather, a person who unknowingly fails to act—even when such a failure is objectively unreasonable—is negligent at most. *Id.* And the Supreme Court has made clear that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 135 S. Ct. at 2472 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

Realizing this difficulty, the majority fiddles with the standard applicable to failure-to-act claims to create a new

test: It holds that a pretrial detainee can state a due process violation for an official's failure to act by showing that (i) the official made an intentional decision with respect to the plaintiff's conditions of confinement; (ii) the decision put the detainee at substantial risk of suffering serious harm; (iii) the official was objectively unreasonable in not fixing the risk; and (iv) the failure to undertake a fix caused the detainee's injuries. Maj. Op. at 19–20.

This test simply doesn't fit a failure-to-act claim. On its face, the majority's test is underinclusive; it may relieve some officials of liability despite their deliberate indifference. For instance, under a straightforward application of the test, we would have come out a different way in *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003). In that case, Lolli, a pretrial detainee, told Deputy Walker that he was diabetic, feeling very sick, and needed food. *Id.* at 420. Deputy Kent was merely standing near Deputy Walker when Lolli shared this information. *Id.* at 420. We held that Deputy Kent could be liable based on his failure to provide medical care to Lolli because a reasonable jury could have found that Deputy Kent actually perceived Lolli's serious medical need and failed to bring him food. *Id.* at 420–21. Under the most natural reading of the majority's new test, Deputy Kent could not be held liable because he made no "intentional decision with respect to the conditions under which the plaintiff was confined." *See* Maj. Op. at 19–20. In other words, while the majority's test fits the specific facts of this case, where the individual officers intentionally and unreasonably housed Castro with a combative inmate, it doesn't readily apply in other failure-to-act cases where the plaintiff is unable to point to the officer's intentional decision with respect to the plaintiff's conditions.

To avoid this outcome, the majority simply announces that a juror would likely conclude that if a "defendant actually knew of a substantial risk of serious harm and consciously took no action," then "the defendant made an intentional decision" with respect to the conditions under which the plaintiff was confined, which satisfies the first prong of the majority's new test. Maj. Op. at 20 & n.4. Of course, this is merely the old deliberate indifference standard. The rest of the majority's test adds nothing to this standard (the second prong requires a showing that the officer's inaction "put the plaintiff at substantial risk of suffering serious harm," and the third prong requires a finding that the officer "did not take reasonable available measures to abate that risk"). Maj. Op. at 19–20. The majority apparently reinstates the deliberate indifference standard because it cannot explain how an official's failure to act could otherwise constitute an intentional decision. In other words, the majority has simply dressed up the *Farmer* test in *Kingsley* language for no apparent reason; it conflates the two standards only to end up where we started.

In sum, the majority unnecessarily muddles our long-standing test for claims alleging that an officer's failure to act amounted to punishment based on its mistaken assumption that it must achieve consistency with the test enunciated in *Kingsley*. But *Kingsley* applies to a different category of claims: those involving intentional, objectively unreasonable actions. Because the majority's reasoning is both mistaken and unnecessary, I dissent.